[Crim. No. 9647. Fourth Dist., Div. Two. Mar. 16, 1978.]

In re BUDDY EARL WRIGHT on Habeas Corpus.

COUNSEL

Raymond C. Youngquist and Roger S. Hanson for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Karl J. Phaler, Deputy Attorneys General, for Respondent.

OPINION

KAUFMAN, J.—In 1973 a jury convicted petitioner of kidnaping (Pen. Code, § 207) and rape by threat of force (Pen. Code, § 261, subd. 3) and found he was armed with and used a firearm in connection with each offense. The judgment of conviction was affirmed on appeal by this court

in an unpublished opinion (4 Crim. 6056). Petitioner, who is presently confined in state prison seeks habeas corpus on grounds of newly discovered evidence and false testimony by the principal prosecution witness.

On December 17, 1976, petitioner filed an application for writ of habeas corpus in Kern County Superior Court. That petition was subsequently transferred to and filed in the Superior Court of San Bernardino County. Following an extensive evidentiary hearing, the San Bernardino Superior Court denied the petition for habeas corpus. Thereafter petitioner filed the instant petition for habeas corpus directly in the California Supreme Court. That court ordered the Director of the Department of Corrections to show cause before this court why the relief prayed for should not be granted.

## The Evidence at Trial

The case for the prosecution can be summarized as follows. On May 2, 1972, Mary R. resided at her mother's house in Ontario. At 11:30 p.m. enroute from her mother's house to her place of employment she stopped at the Circle K Market to purchase something to eat during her lunch break. After making her purchase, she returned to her unlocked car. As she was putting the key into the ignition, petitioner jumped into the car on the passenger side, pointed a gun at her face, and ordered her to turn the car radio off and to pull out of the parking lot.

Petitioner gave her various directions and, while proceeding past the Armory at John Galvin Park, petitioner ordered her to turn in the driveway and to park. Petitioner told Mary, "I want a little," got out on the passenger side, and told her to get out the same side.

Petitioner put the gun into his pocket and took Mary to the bushes against the wall of the Armory. He ordered her to take her clothes off and had intercourse with her. Petitioner then told her to get dressed, and they returned to the car. In her hurry to "get out of there and get away," Mary left her bra behind.

Petitioner directed Mary to drive on various streets and had her stop the car and let him out on Del Norte Avenue. Mary immediately went to her mother's house and reported the incident to her mother. Her father immediately notified the police.

A description of petitioner was broadcasted over the police radio. Shortly after midnight on May 3, a man resembling the description broadcasted was seen by a patrolling police officer in a Chevrolet El Camino parked in the vicinity of the Holiday Inn. The man drove to the Holiday Inn parking lot and entered a room. The officer called for assistance. As he and other officers approached the motel room the man, later identified as petitioner, emerged. The officers told petitioner that they were investigating a possible rape, and one of the officers asked petitioner where he had been. Petitioner replied that he had been to the Circle K Market. The officers then advised petitioner of his *Miranda* rights and petitioner indicated that he understood them and wanted to clear up the matter.

Petitioner told the officers that he had been drinking at the Holiday Inn bar for about a half hour, that he had gone to the Circle K Market at about 12:17 a.m. and stayed about 20 minutes, and that on the way back to the motel his car had stalled. He denied that he had been with a woman that night. He stated that he did not have a gun.

Investigating officers found a brassiere in the bushes next to the wall of the Armory. On the morning of May 3, a student on the way to school found a .45 automatic wrapped in a towel on the sidewalk next to a field near the Holiday Inn. An examination of Mary R. disclosed scratches on the right thigh, on the back at the bra level, and on the right buttock. A vaginal smear revealed the presence of semen.

The defense was that Mary R. solicited and agreed to an act of prostitution, consented to intercourse and accused petitioner of rape because he failed to pay her the amount agreed upon. Petitioner testified he was the owner of a business engaged in highway construction; on May 2, 1972, he had come from his home in Visalia to Riverside to discuss some $27,000 owed him by the Sansone Company; he checked into the Holiday Inn at approximately 5 p.m. on May 2, 1972; he drank in the Holiday Inn bar from approximately 8 p.m. to 11 p.m.; he attempted to get something to eat at the Holiday Inn but learned it was too late; he drove to the Circle K Market to get something to eat; after he completed his purchase, he was approached by a young man outside the market who asked, "How would you like to have some of that," referring to a young woman inside the market whom petitioner identified as Mary R.; the young man indicated petitioner would have to discuss the financial arrangements with her; Mary R. emerged from the store, engaged petitioner in conversation and invited him into her automobile; after

some haggling she agreed to have intercourse with him for $20; petitioner agreed to pay her $10 before and $10 after the act; since he had some doubts what he might be getting involved in, he went back to his vehicle to get his brother's .45 caliber automatic he had in the glove compartment; he put the automatic in his jacket pocket but never pointed it at Mary; after having intercourse Mary became enraged when she discovered that petitioner could not pay her the additional $10 and told him, "I will show you." As he was driving his vehicle back to the Holiday Inn, petitioner was concerned that Mary might try to make trouble for him and became nervous when he saw police cars. He wrapped the .45 automatic in a towel and threw it out the door of his vehicle.

During the People's case in chief, on direct examination Mary R. testified that on the date of the rape she was married but was living apart from her husband and had a boyfriend. She denied that petitioner ever negotiated with her for an act of prostitution; she denied petitioner discussed giving her any money; and she denied that he gave her any money.

On cross-examination she testified she had lived in an apartment at 2644 Angela in Pomona and that that residence was shared by a number of other persons including Pam Lane Wallace, Betty Lou, Douglas Seibert, Richard Kilgore (nicknamed Hammy) and Frank DeMarte. She testified Larry Reynolds moved into that apartment when she moved out. She testified she had not had sexual relations with a man not her husband other than Frank DeMarte. She denied having sexual relations with Douglas Seibert or Larry Reynolds. She denied engaging in an act of sexual intercourse with anybody on an occasion when she went to the Colorado River around Easter of 1972.

Although the court restricted petitioner's cross-examination of Mary on the subject of her use of seconal, she did admit frequent use of seconal and amphetamines and indicated their use could produce symptoms of anger or short temper.

During trial, at a hearing outside the presence of the jury on petitioner's renewed *Ballard* motion to compel a psychiatric examination of Mary R., Mary denied having sexual relations with Jim Newlin and denied staying overnight at his apartment on Canoga Street in Montclair.

## The Evidentiary Hearing

In support of his petition for habeas corpus in the superior court, petitioner filed several declarations executed by Douglas Seibert including one dated January 9, 1975, and another dated November 13, 1975. In the latter declaration Seibert stated: "I first met Mary . . . in March or April, 1972 when she was with her brother-in-law, Larry Reynolds. Larry and Mary had been out eating pills (reds) and Larry asked me if I would like to 'party' with them. He said that if I gave Mary Twenty ($20.00) Dollars she would go to a motel and party with me all I wanted. I agreed and four of us (Larry took a girl named Shelly) went to the Motel Six on Holt Avenue in Pomona. I paid Mary Twenty ($20.00) Dollars and paid for the motel room. We spent the night there and I had sexual intercourse with Mary. Because Mary was a sexually aggresive [sic] person she preferred engaging in intercourse while on top. She made it clear that she was doing this only because I paid her the money . . . .

"About a week or two after this, Mary, myself, Frank DeMarte, Richard Killgore [sic], and Pam Wallace all moved into an apartment on Artesia, near County Road in Southern Pomona. I got to know Mary well during this time. Her husband, Larry's brother, had been busted with Larry's wife and he was doing time in Nevada. Mary, her husband, Lary [sic] and his wife had all traded off, that is, partied together. During this time Mary was sleeping with Frank DeMarte and a lot of other people. Whenever she needed money, especially to buy reds, she would go out and sell herself to get the money.

"Once Mary, myself, Pam Wallace and a friend, Tom Burton, went to the Colorado River over the Easter vacation. Mary sold herself to get money for reds. We spent about three days there, but Mary didn't have enough reds with her. We had driven down there in Burton's car, but he left after the first day and came back to Pomona. We needed money to get home and Mary needed money for more reds. She asked me to pimp for her. I asked several guys in the area, but they said they didn't need to pay for it. Mary said she would do it herself. She went out and after awhile came back with the money. She generally preferred to have someone pimp for her to make sure that it was okay, but she would do it herself if it looked alright.

"On another occasion, Larry, his wife, Mary and myself went to Las Vegas and we ran out of money. Mary asked me to pimp for her with

some of the guys at the crap table. I told her that you couldn't do that at these clubs and that you could get in a lot of trouble. But she was all loaded on reds, so she went off by herself and came back in about an hour or an hour and a half with One Hundred ($100.00) Dollars. This was sometime around the first of 1972, about March or April.

"Mary had a very heavy habit with reds. She used about fifty to one hundred a day when she had them available. I have seen her go into convulsions when she could not get them. When she was not on 'downers' she was a real 'bitch' and very wild. I have seen her use cocaine on one occasion.

"Mary liked sex and would give it away if she didn't need money for reds. If she did need money, she would insist on getting paid for it. After having sexual intercourse, she was 'crazy' and it was difficult to tell how she would act.

"On the night of May 2, 1972, I was at Apartment 'A', Jim Newland's [*sic*], on Canoga Street and Mary came by. She said that she had a chance to get a jar of reds at work and needed money. A jar would be about one thousand reds and would cost about Eighty ($80.00) to One Hundred ($100.00) Dollars. She asked me to go down to the store with her and pimp for her so she could get some money. I was sick that night and told her I didn't want anything to do with it. The apartment was about a half block from the Seven-Eleven store [*sic*]. She came by at about 6:00 P.M. Later, I talked to Larry Reynolds and he told me that she had told him to find somebody at the store and set up a deal for her. Larry said that he did it; he said that he asked this guy at the store if he would like to have this chick going into the store, and the guy said that it looked okay. Larry said that he saw the guy leave her car to go back to his own car and that when he started to get back into Mary's car, he saw him drop his gun. When he saw that, Larry took off because he didn't know what was going on. . . ."

Several times during the course of the hearing the presiding judge made it clear that the reason he had granted the evidentiary hearing was Seibert's statements to the effect that Mary R. had prostituted herself on various occasions, that she had asked Seibert to pimp for her on the night of the rape and that Larry Reynolds had told Seibert that in fact he had solicited petitioner for Mary on the night of May 2, 1972. He indicated that these were the matters on which he was most interested in hearing testimony.

At the evidentiary hearing Douglas Seibert was sworn as a witness. Initially, he was asked whether his declarations of January 9 and November 13, 1975 were true and correct. He stated that Larry Reynolds and his wife had not accompanied Mary R. and Seibert to Las Vegas, but that otherwise both declarations were true and correct.

On specific interrogation he affirmed that he and Mary and Larry Reynolds and a girl named Shelly went to Motel 6 in March or April 1972. He testified the parties switched sexual partners all night and that he had sexual intercourse with both women. With respect to his payment of $20 to Mary, he testified that this payment occurred "later on in the night"; that when the parties first went into the motel room he was paired with Shelly and Larry Reynolds was paired with Mary; and that, subsequently, he said to Mary: "Here, Mary, I'll give you 20 bucks if you'll go with me." He testified the room was a single room with two beds.

Seibert did move into an apartment with Mary, Frank DeMarte, Richard Kilgore and Pam Wallace. He testified he had sexual relations with Mary at the apartment even during the time she was going with DeMarte. However, he never observed her in an act of sexual intercourse with another man and he never saw her receive money in exchange for sexual favors.

Although he affirmed the episode at the Colorado River in which Mary left and returned with money, he did not testify that he solicited an act of prostitution for her. On the contrary, he testified that he never offered her sexual favors for sale.

He reaffirmed as correct his declaration statements about the episode in Las Vegas where Mary went off by herself and came back with $100.

With respect to Mary's use of drugs, Seibert denied stating he had seen Mary take 50 to 100 pills on several occasions. He testified that the most pills he saw Mary take at one time was five and that sometimes he saw her take from fifteen to twenty pills a day. When asked his opinion as to whether or not Mary would sell herself to get pills, his answer was: "Her character at that time probably wasn't any different than any of ours. You know, everybody was into the red trip, and that's all it was."

With respect to his declaration statement that on the night of May 2, 1972 (the night of the rape) Mary asked him to pimp for her so she could

get some money to buy a "jar of reds" at work, Seibert testified that he did not know whether or not the conversation took place the same day as the rape. He reaffirmed, however, that he did have a conversation with Mary in which she wanted to buy a jar of reds and wanted him to "go down to the store" with her.

In respect to the declaration statement to the effect that Larry Reynolds had admitted pimping for Mary the night of the rape, Seibert testified that it was Larry Reynolds who told him about the rape and that: "He did state that he had asked someone if they wanted this girl; that she looked nice; and that—he was real vague about it, though."

Seibert testified that he left the State of California about two to three months after the end of April 1972 because of a problem involving the revocation of his probation and that he remained out of the state until sometime after petitioner's trial.

Larry Reynolds, Mary's former brother-in-law, also testified at the evidentiary hearing. He denied having been present at the Circle K Market on the night of the rape, denied having introduced Mary to petitioner and denied ever having seen petitioner. He denied having seen petitioner drop a gun outside the Circle K Market and denied ever having told Douglas Seibert he had. In fact he had no recollection of ever discussing any of these matters with Seibert. He said it was possible he had once gone with Mary to the Circle K Market at night prior to her going to work for the purpose of buying some beer or groceries, and, if so, that probably was in 1971. He further denied having pimped for Mary in April or May of 1972 or at any other time. He also denied that Mary had ever asked him to do so.

Reynolds did state that he, Seibert, Mary and another woman named Shelly went to a motel in Pomona on one occasion. So far as he knew, Seibert did not pay money to Mary in return for sexual favors. So far as he knew, Mary had never committed an act of prostitution.

He did live in an apartment on Angela Street which was shared by Mary, Seibert, DeMarte, Kilgore and Pam Wallace. He had sexual relations with Mary on one or two occasions. He never saw Mary engage in sex with any other individual, but he believed Mary had had sexual relations with Frank DeMarte and Douglas Seibert. He had gonorrhea at about the time he had sexual relations with Mary, and he believed Seibert and DeMarte also had gonorrhea about the time they were living

in the Angela Street apartment. He believed Mary also had gonorrhea and had gone to Dr. Hederman for treatment. Mary had stayed overnight on occasion at Jim Newlin's apartment and Reynolds believed she had had sexual relations with Newlin to whom she was now married. Although Reynolds believed Mary would willingly engage in sexual relations with the person with whom she was currently going, she would only have intercourse with the person she was keeping company with at that time. He denied Mary "switched off" or had sequential intercourse with groups of men.

Reynolds testified that although Mary used pills, she was steadily employed and seemed to have sufficient money. Although she contributed to the purchase of pills, she was not the main source of the money for their purchase. Mary had told Reynolds that she was able to purchase pills at work. The most he had seen Mary take was two to five pills at one time. He had never heard of Mary prostituting herself for money or for pills.

In response to questions by the court, Reynolds testified he did not leave the area after the date of the rape, that at the time of trial he was living in Pomona and that all his life he had lived in either Pomona or Ontario.

Dr. Arthur Hederman, M.D., testified that in April 1972 he treated Mary R. for gonorrhea. Mary was last treated on April 28, 1972. At about that same time he also treated Douglas Seibert for gonorrhea. Also admitted into evidence were records of the Los Angeles County Health Department showing that Mary R. was being treated for venereal disease from November 1971 until April 1972.

Testimony of a representative of Motel 6 fixed the date of the Motel 6 incident involving Douglas Seibert, Larry Reynolds, Mary R. and Shelly as March 14, 1972.

The judge presiding at the evidentiary hearing did not make formal findings. However, his comments during and at the close of the evidentiary hearing reveal his factual determinations.

"*The thing that impressed me* [about the petition and its accompanying declarations and affidavits] was not the fact that we may have had a promiscuous young woman or that somebody was overindulging in drugs but rather that there had been a deliberate solicitation of prostitution by

the alleged victim with her pimp and that this was corroborated apparently from the declaration of Seibert. He put Larry Reynolds right on the scene consistent with Mr. Wright's testimony. He corroborated Mr. Wright's testimony right down the line in all crucial and material points; even to the fact of having Lary [*sic*] Reynolds tell him about it; even to seeing Mary before on that very night and having indications of her intent and her need for drugs; to having Mr. Reynolds not only tell him about the solicitation and the pointing out of the alleged victim but also the gun. All of these things are very persuasive to me, and in that type of a situation, *had I remained convinced of that,* I certainly would grant your petition." (Italics added.)

"Based upon the evidence that I've heard and the transcripts, the argument of counsel, and the witnesses that have been before me . . . I can say that I believe either that the complaining witness committed perjury or at least *there's a strong probability that she committed perjury, that she had indeed had sexual relations with men other than her husband and Frank DeMarte,* and further that such evidence would be of assistance to the defense, that it was material, and that it has some probative value. . . ." (Italics added.)

"Certainly I believed that the victim, together with Seibert and Reynolds, at one point shared that Motel 6. I certainly believe that there was sex within there. . . ."

"The only act of prostitution, however, that was revealed in the evidence presented before this court on this occasion was the one time outside of the inferences of she didn't have money; she's gone; she comes back with money, which is not the best inference in the world. It was Mr. Seibert's testimony that, hey, four of us went to the motel, and I started out with Shelley, and we balled all night, in effect, and later on I had to give Mary $20 in order to get sex with her. And I must have expressed my incredulous reaction at the time. *I did not believe him. I think he flatly committed perjury himself on the point.* That knocked out completely your prostitution, the one act of concrete prostitution. It knocked out completely the thing that really impressed me at the time of the reading of the affidavits." (Italics added.)

Thus the judge found Mary R. had given perjured testimony at trial but that it related only to her denial of having sexual intercourse with men other than her husband and Frank DeMarte. He concluded there was *no reasonable* probability a different result would have been had at

trial had the true facts been shown and the false testimony was not "substantially material or probative on the issue of guilt or punishment" as required by Penal Code section 1473, subdivision (b)(1).

### Effect of Superior Court's Factual Determinations

■ At the outset we must determine what effect is to be given the factual determinations of the superior court. Where an appellate court on an application for habeas corpus has appointed a referee to conduct an evidentiary hearing the rules are well settled: the appellate court is not bound by the factual determinations of the referee but, rather, independently evaluates the evidence and makes its own factual determinations; the factual determinations of the referee are entitled to great weight, however, when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the referee heard and observed. (*In re Rosoto,* 10 Cal.3d 939, 946 [112 Cal.Rptr. 641, 519 P.2d 1065]; *In re Branch,* 70 Cal.2d 200, 203, fn. 1, 211 [74 Cal.Rptr. 238, 449 P.2d 174]; *In re Imbler,* 60 Cal.2d 554, 562 [35 Cal.Rptr. 293, 387 P.2d 6].) Where, as here, an application for habeas corpus has been denied in the superior court after an evidentiary hearing and a new application for habeas corpus is thereafter made to an appellate court based upon the transcript of the evidentiary hearing in the superior court, the procedure to be followed appears to be open to some question. (See *In re Hochberg,* 2 Cal.3d 870, 874, fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1] [independent appraisal of the evidence], citing *In re Smiley,* 66 Cal.2d 606, 611 [58 Cal.Rptr. 579, 427 P.2d 179], *et passim;* but cf. *In re Podesto,* 15 Cal.3d 921, 937 [127 Cal.Rptr. 97, 544 P.2d 1297] [trial court's determination on application for bail on appeal will not be upset except for abuse of discretion].)

In our view, for all practical purposes the successive-writ situation is essentially the same as where the appellate court has made a reference. When a reference is made by a Court of Appeal, the referee appointed is customarily a judge of the superior court and, of course, the opportunity to hear and observe the witnesses is the same whether the judge is acting as a referee appointed by the appellate court or as a judge of the superior court. We hold, therefore, that the rules applicable to an appellate court's review of its referee's factual determinations obtain also in a case where the superior court has denied habeas corpus after an evidentiary hearing and a petition for habeas corpus is thereafter presented to an appellate court based upon the transcript of the evidentiary hearing conducted in

the superior court. (See *In re Hochberg, supra,* 2 Cal.3d at p. 874, fn. 2; *In re Smiley, supra,* 66 Cal.2d at p. 611, *et passim.*)

Independently evaluating the evidence presented at the evidentiary hearing, and giving due consideration to the fact that the judge of the superior court heard and observed the witnesses and we did not, we find the judge's determinations of fact concerning or depending upon credibility of witnesses fully justified, and we agree with and adopt them. As shall appear, however, we do not entirely agree with all of the judge's evaluations and characterizations of the significance of the false testimony.

### Newly Discovered Evidence

Petitioner does not sufficiently distinguish the ground of newly discovered evidence from the ground of perjured testimony. His arguments often admix the two. While, of course, the discovery of perjured testimony will almost necessarily involve the discovery of new evidence, these constitute distinct grounds for habeas corpus relief, are subject to different legal standards and must be considered separately. (See, e.g., *In re Imbler, supra,* 60 Cal.2d at pp. 560-567, 569-570.)

To warrant habeas corpus relief new evidence must be such as to undermine the entire structure of the case upon which the prosecution was based; it must point unerringly to the petitioner's innocence and must be conclusive; it is not sufficient that the new evidence conflicts with that presented at the trial and would have presented a more difficult question for the trier of fact. (*In re Weber,* 11 Cal.3d 703, 724 [114 Cal.Rptr. 429, 523 P.2d 229]; *In re Branch, supra,* 70 Cal.2d at pp. 213-215; *In re Imbler, supra,* 60 Cal.2d at pp. 569-570; *In re Lindley,* 29 Cal.2d 709, 724 [177 P.2d 918].) Concomitantly, the new evidence must be credible and convincing. (See *In re Weber, supra,* 11 Cal.3d at pp. 723-725; *In re Branch, supra,* 70 Cal.2d at pp. 214-215; *In re Imbler, supra.*)

Petitioner's contention that the foregoing rules were changed or abrogated by *In re Ferguson,* 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234], is not meritorious. Although, of course, new evidence had been discovered by the defendant in *Ferguson,* that case involved what the court found to be a suppression by the prosecuting attorney of material evidence favorable to the defendant. The standards there discussed and announced relate to the duty of the prosecutor to disclose to an accused

favorable material evidence known or which should have been known to the prosecutor. The rules governing habeas corpus relief on the ground of newly discovered evidence were in no way implicated or questioned. Indeed, in *In re Weber,* three years after the *Ferguson* decision, the latter rules were rearticulated and applied. (11 Cal.3d at p. 724.)

Similarly without merit is the contention found in the traverse that the rules laid down in *Lindley, Imbler, Branch* and *Weber* were abrogated by the 1975 amendment to Penal Code section 1473 dealing with habeas corpus relief on the ground of false evidence. This contention is born of petitioner's failure to distinguish between the grounds of perjured testimony and newly discovered evidence. The rule that to be sufficient for habeas corpus relief, the new evidence must undermine the entire structure of the prosecution's case applied only to newly discovered evidence; it never applied to perjured testimony. (See *In re Imbler, supra,* 60 Cal.2d at pp. 560, 569; *In re Lindley, supra,* 29 Cal.2d at pp. 722, 724.) The 1975 amendment to Penal Code section 1473, which we hereinafter discuss in detail, dealt only with habeas corpus relief on the ground of false evidence. It did not change the law relating to the ground of newly discovered evidence.

The most significant portions of the asserted newly discovered evidence was with ample justification disbelieved by the judge presiding at the evidentiary hearing. The only evidence that Mary R. had previously engaged in an act or acts of prostitution came from Douglas Seibert. While the judge believed that sexual intercourse took place at the Motel 6, he did not believe that Seibert paid Mary $20 for her sexual favors on that occasion and, in fact, felt that Seibert perjured himself in so testifying. He felt Seibert's testimony to the effect that the parties switched sexual partners all night but that the payment of $20 to Mary did not occur until "later on in the night" was rather incredible. We agree. Moreover, Seibert's testimony concerning this episode was at odds with his declaration statement in several material respects. In the declaration Seibert implied he paid Mary $20 before having sexual relations with her, stated she made it clear she had intercourse with him only because of payment, and indicated he was introduced to Mary for the first time that same night by Larry Reynolds who took the girl named Shelly to the motel. His testimony indicated he had met Mary on prior occasions, that Larry Reynolds was originally paired with Mary and, of course, that he did not pay the $20 until "later on in the night." Similarly, Seibert's declaration statements to the effect that Mary would sell herself for money or reds were contradicted by his testimony at the

evidentiary hearing that he never saw her receive money in exchange for sexual favors and never observed her in an act of sexual intercourse with another man and by his evasive, nonresponsive answer to the question whether it was his opinion that Mary would sell herself to get pills. As the judge observed, the testimony concerning the Colorado River and Las Vegas incidents in which Mary assertedly left and returned with money, even if believed, constituted exceedingly weak evidence of prostitution. Moreover, with respect to the Las Vegas incident, Seibert testified he did not offer Mary's sexual favors for sale and, in fact, never had, contradicting his declaration statement that he did.

It is also clear from the judge's comments that he did not believe Seibert's story that Mary had asked him to pimp for her on the night of the rape so she could get money to buy pills and that Larry Reynolds had subsequently told him he had pimped for her at the store that night and had seen the man drop his gun. Again, the judge's disbelief was fully justified. While Seibert's declaration statements were definite and detailed, his testimony at the evidentiary hearing concerning these two conversations was vague and indefinite (e.g., she wanted him to "go down to the store" with her; "[h]e did state that he had asked someone if they wanted this girl . . . he was real vague about it though"). In his declaration, Seibert states the conversation with Mary definitely took place on the night of May 2, 1972, a critical fact. At the evidentiary hearing, however, he testified he did not know whether the conversation took place on the night of the rape. In addition, of course, Larry Reynolds testified unequivocally that he was not with Mary at the Circle K Market on the night of the rape, that he had never solicited an act of prostitution for Mary and that he had never before seen petitioner. He further denied having told Seibert he saw a man drop a gun and had no recollection of ever discussing this matter with Seibert. The judge, of course, saw and heard these witnesses and was in the best position to determine which of them was telling the truth.

The remaining asserted newly discovered evidence is: (1) Mary had a considerable seconal habit, taking 2 to 5 pills at a time and up to 20 pills a day; (2) Mary said on one or more occasions that she sometimes bought pills at work; (3) Larry Reynolds admitted it was possible he had once gone with Mary to the Circle K Market at night prior to her going to work, probably in 1971, for the purpose of buying some beer or groceries; (4) in addition to having had sexual intercourse with Frank DeMarte, which she admitted, Mary had had sexual intercourse with Douglas Seibert, Larry Reynolds and Jim Newlin and in connection with

that fact (a) Mary stayed overnight at the apartment of Jim Newlin on Canoga Street and (b) Larry Reynolds lived in the Angela Street apartment with Mary and the group prior to the time Mary moved out; (5) at about the time of the rape Mary, DeMarte, Seibert and Reynolds all had gonorrhea.

Except as to the number of pills she was taking, the fact that Mary had a considerable seconal habit is not new evidence. She testified at trial she frequently used seconal and mentioned some of the effects of such use. Since the rape occurred May 2, 1972, the possibility that Reynolds may have gone to the Circle K Market with Mary some night in 1971 before she went to work is either completely irrelevant or so lacking in probative value as to necessitate no further comment. The importance petitioner attaches to the fact that Mary said she sometimes bought pills at work is unwarranted. That she was on her way to work when the rape occurred and was able to buy pills at work, without more, does not give rise to an inference she prostituted herself for the purpose of buying pills at work on the night in question. As previously observed, the presiding judge did not credit Seibert's statement relating a conversation between Mary and him on the night of the rape in which she indicated she needed money to buy a jar of reds. In this connection, we note that Reynolds testified at the evidentiary hearing that, although Mary used pills, she was steadily employed and seemed to have sufficient money. At trial, Mary testified without contradiction that she had money, that she had just been paid the day of the rape.

■ Petitioner relies most heavily on the new evidence that Mary had sexual relations with Seibert, Reynolds and Newlin at about the same time.[1] He asserts that this evidence clearly substantiates his claim that Mary prostituted herself. On the contrary, this evidence is barely material, if material at all, has no probative value whatever on the issue of prostitution and, indeed, would not even be admissible evidence in a new trial.

The fact that Mary had consensual sexual relations with four male acquaintances over a relatively short span of time simply does not give rise to a natural or logical inference that she was a prostitute or that she committed an act of prostitution with a total stranger on the night of May 2, 1972. Neither does the fact Mary, Seibert, Reynolds and DeMarte all

---

[1]Petitioner asserts as a fact that Mary infected the men with gonorrhea, but the evidence is simply that they all had the disease at about the same time. The conclusion that Mary infected the men is wholly unwarranted.

had gonorrhea at about the same time. The only inference to which the latter fact gives rise is that each of those persons had prior sexual intercourse with a person who had the disease. In view of its limited probative value and obvious prejudicial effect, it is questionable whether the evidence of venereal disease would have been admitted at trial even if it had been known and offered. (See Evid. Code, § 352.)

Moreover, this evidence would not be admissible in a new trial. Contrary to the rule that prevailed at the time of trial, under Evidence Code section 1103 as amended in 1974 (Stats. 1974, ch. 569, § 2, p. 1388), unless first introduced by the prosecution, evidence of the complaining witness' sexual conduct other than with the defendant is not admissible to prove consent in a prosecution for rape. (Evid. Code, § 1103, subd. (2)(a); see *People* v. *Blackburn,* 56 Cal.App.3d 685, 690 [128 Cal.Rptr. 864].) Thus, were petitioner afforded a new trial he would not be permitted to introduce the new evidence credited by the judge at the evidentiary hearing that Mary had sexual intercourse with Reynolds, Newlin and Seibert. In a new trial he could not even show Mary had sexual relations with Frank DeMarte. Nor would he be permitted to show Mary, DeMarte, Seibert and Reynolds all had gonorrhea.[2]

Petitioner's contention this evidence would be admissible under an exception prescribed by subdivision (2)(c) of Evidence Code section 1103 is not meritorious. That subdivision provides that, if the prosecutor introduces evidence relating to the sexual conduct of the complaining witness, the defendant may cross-examine with respect to such evidence and offer relevant evidence "limited specifically to the rebuttal of such evidence introduced by the prosecutor. . . ." It is true the prosecution in its case in chief elicited testimony from Mary that she was married, that she was separated from her husband and had a boyfriend, that petitioner did not negotiate with her for an act of prostitution and that petitioner neither discussed giving her any money nor gave her any money. The last two items related exclusively to Mary's conduct with petitioner. The other questions asked and facts elicited related to Mary's marital status and social arrangements. They were not sufficiently related to Mary's sexual conduct to open up the subject of her sexual conduct with men other than petitioner to cross-examination and rebuttal evidence under

---

[2]As we have observed, evidence that Mary had gonorrhea is not relevant to prove she prostituted herself. The only inference logically and naturally flowing from that fact is that she had sexual intercourse with a person who had the disease. Accordingly, that evidence would be inadmissible under Evidence Code section 1103, subdivision (2)(a) and the evidence the men had gonorrhea would be rendered irrelevant to any material issue in the case.

subdivision (2)(c). Moreover, the fact that she had consensual sexual relations with a number of male acquaintances and that she and several of them had gonorrhea would not tend logically or naturally to discredit or rebut any fact elicited by the prosecution in the examination alluded to.[3]

Whether, considered separately or in combination, it cannot be said that petitioner's credible new evidence undermines the entire structure of the case upon which the prosecution was based nor that it points unerringly and conclusively to petitioner's innocence. At most, it conflicts with the evidence presented at trial and would have presented a more difficult question for the trier of fact. Habeas corpus relief on the ground of newly discovered evidence is therefore not warranted. (*In re Weber, supra,* 11 Cal.3d at p. 724; *In re Branch, supra,* 70 Cal.2d at pp. 213-215; *In re Imbler, supra,* 60 Cal.2d at pp. 569-570; *In re Lindley, supra,* 29 Cal.2d at p. 724.)

### *Perjured Testimony—False Evidence*

Prior to the 1975 amendment to Penal Code section 1473, the rule was clear that to obtain habeas corpus relief on the ground of perjured testimony, the petitioner was required to establish by a preponderance of the evidence: (1) that perjured testimony was adduced at his trial, (2) that this was known to a representative of the state, and (3) that the perjured testimony may have affected the outcome of the trial. (*In re Imbler, supra,* 60 Cal.2d at p. 560; *Napue* v. *Illinois,* 360 U.S. 264, 269, 272 [3 L.Ed.2d 1217, 1221, 1223, 79 S.Ct. 1173]; see Witkin, Cal. Criminal Procedure (1975 supp.) § 804, p. 866.)

In 1975 (Stats. 1975, ch. 1047, § 2) Penal Code section 1473 dealing with habeas corpus relief was amended to provide in pertinent part:

"(b) A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons:

"(1) False evidence that is *substantially material or probative on the issue of guilt or punishment* was introduced against a person at any hearing or trial relating to his incarceration; . . .

---

[3]The exception relied on by petitioner was also added by the 1974 amendment. (1974 Stats., ch. 569, § 2, p. 1388.) Being mindful thereof it is not likely in a new trial that a knowledgeable prosecutor would risk asking even the innocuous questions whether Mary was married, separated or had a boyfriend.

"
. . . . . . . . . . . . . . . . . .

"(c) Any allegation that the prosecution knew or should have known of the false nature of the evidence referred to in subdivision (b) is immaterial to the prosecution of a writ of habeas corpus brought pursuant to subdivision (b)." (Italics added.)

Although the judge found Mary R. had given perjured testimony at trial, he concluded the perjured testimony was not "substantially material or probative on the issue of guilt or punishment" as required by Penal Code section 1473, subdivision (b)(1) and that there was no reasonable probability a different result would have obtained at trial in the absence of the perjured testimony. Petitioner contends these conclusions resulted from the application of erroneous standards and are wrong.[4] We, of course, are not bound by the judge's conclusions nor by the standards employed by him.

The contentions of the parties raise the question to what extent the preexisting law pertaining to habeas corpus relief on the ground of perjured testimony was changed by the 1975 amendment to Penal Code section 1473 and, in particular, whether a petitioner seeking relief under the amended statute is still required to show the false evidence may have affected the outcome of his trial and what is meant by the statutory language "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment." ▮ Exercising our independent judgment, we have concluded: the judge's finding that Mary R. gave false testimony at trial in certain particulars is correct; the requirement under the preexisting law that the petitioner show the false evidence may have affected the outcome of his trial was not eliminated or changed by the 1975 amendment to Penal Code section 1473 and is still required for relief under the amended statute: "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment" means false evidence of such significance that it may have affected the outcome of

---

[4]Petitioner's assertion the judge applied the "must undermine the entire structure of the prosecution's case" standard to the false testimony problem is not justified by the record. The judge was greatly concerned with the meaning of "substantially material" as used in Penal Code section 1473, subdivision (b)(1) and whether there was "a reasonable probability that the trier of the fact[s] would have arrived at a different decision." Petitioner also criticizes the judge's use of the expression "*would* have arrived at a different decision" and urges that if any such standard is applicable, the formulation should be "*could* have arrived at a different decision." Although from a practical standpoint we think there is little difference, the use of the word "could" might have been more appropriate than "would." (See *In re Ferguson, supra,* 5 Cal.3d at p. 535.)

the trial; and petitioner has not made the requisite showing that the false testimony here disclosed may have affected the outcome of his trial.

Little need be said in support of our conclusion that Mary R.'s testimony denying sexual relations with men other than her husband and Frank DeMarte was false. The People do not contend the judge's conclusion that this testimony was false[5] was unjustified and, although some of the testimony credited by the judge might constitute inadmissible opinion evidence upon proper objection, we think this finding justified and adopt it.

Petitioner places great reliance on the presiding judge's statement that the evidence Mary R. had sexual relations with Seibert, Reynolds and Newlin in addition to DeMarte, "would be of assistance to the defense, that it was material, and that it has some probative value. . . ." He contends that, this being so, he is entitled to habeas corpus relief under Penal Code section 1473, subdivision (b)(1) without more. As will appear in subsequent discussion, we have reservations about these evaluations of the judge. However, the point to be made at this juncture is that petitioner is mistaken if his contention is that he is entitled to habeas corpus relief under the amended statute upon showing no more than false testimony relevant to a material issue and that the true facts would have been helpful to the defense. Under the well-settled law prior to the 1975 amendment, it was incumbent upon the petitioner to show the perjured testimony was such that it may have affected the outcome of the trial. (*In re Imbler, supra,* 60 Cal.2d at p. 560; *Napue* v. *Illinois, supra,* 360 U.S. at p. 272 [3 L.Ed.2d at p. 1223].) There is no indication the 1975 amendment to Penal Code section 1473 was intended to eliminate this requirement. Indeed, the indications are to the contrary.

---

[5]The judge referred to the false testimony as "perjured." We do not know whether he intended to use that word in a technical, legal sense or a popular sense, but we shall refer to the testimony in question as false testimony rather than perjured testimony. To obtain a conviction for perjury, the prosecution is required to prove a number of technical elements with which we need not here be concerned. One is a materiality requirement that " 'the testimony given could have probably influenced the tribunal before which the cause was being tried. . . .' " (See *In re Imbler, supra,* 60 Cal.2d at pp. 564-565, fn. 2, and cases there cited.) We think there is little if any difference between the materiality requirement "could have probably influenced the tribunal before which the cause was being tried" and the materiality requirement that the false testimony "may have affected the outcome of the trial." In view of our conclusion that the false testimony is not such as "may have affected the outcome of the trial," we doubt the propriety of characterizing the false testimony as "perjured" in a technical, legal sense. Under Penal Code section 1473, subdivision (b)(1), however, it is not required that perjury be proved. A showing of "false evidence" is sufficient. Additionally, it is no longer necessary to show a representative of the state knew the testimony was false. (Pen. Code, § 1473, subd. (c).)

The bill eventually enacted as the 1975 amendment to Penal Code section 1473 was Assembly Bill No. 48 (1975-1976 Reg. Sess.). As amended in the Assembly, May 1, 1975, the materiality requirement contained in the bill read: "False evidence that is material or probative on the issue of guilt or punishment . . . ." There was no express requirement of substantiality. In that same version of the bill there appeared a proposed subdivision (d) to Penal Code section 1473 which read: "Before the court may deny relief for a writ of habeas corpus prosecuted pursuant to subdivision (b), the court must find beyond a reasonable doubt the false evidence or its use to have been harmless." In the analysis of the May 1 version of Assembly Bill No. 48 prepared for use of the Senate Committee on Judiciary it was said the proposed subdivision (d) would clearly constitute "a liberalization of existing law" but that it would be consistent with the recent decision in *People* v. *Ruthford,* 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341] (May 1975). It was pointed out, however, that *Ruthford* involved prosecutorial suppression of evidence whereas the bill dealt with habeas corpus relief for false evidence even though introduced at trial totally without prosecutorial fault. Thus, the propriety of enacting the bill's provision incorporating the "harmless beyond a reasonable doubt" standard was brought into question. The analysis further pointed out that in *Ruthford* it was held that, even where prosecutorial suppression of evidence had occurred, the materiality showing required for relief was not simply that the suppressed evidence was "material" but that it was "substantially material." It was noted that, inappropriately perhaps, the bill's requirement of "material or probative" required a lesser showing for relief than that required where prosecutorial suppression of evidence had occurred.[6] The

---

[6]The analysis reads in pertinent part:

"5. . . . . . . . . . . . . . . . .

"To the extent that this bill removes the apparent condition that the prosecutor knew or should have known that testimony was perjured before the defendant may have relief from his conviction, it appears to be a needed reform.

" . . . . . . . . . . . . . . . . .

"6. This bill would prohibit the denial of a petition for habeas corpus where false evidence was shown, unless it were proved *beyond a reasonable doubt* that the error was harmless.

"This provision, while it clearly is a liberalization of existing law, is consistent with a recent trend in California case law. In *People* v. *Ruthford* (May, 1975) Crim. 18431, the California Supreme Court held that, where the prosecution had suppressed substantial material evidence bearing on the credibility of a key witness, the defendant was entitled to relief unless the suppression was harmless 'beyond a reasonable doubt.'

"This holding was based on the conclusion that the suppression of such evidence constitutes a denial of due process, and thus that the *Chapman* rule, requiring a reasonable doubt standard for the proof of harmless error in such cases, should apply.

"The key distinction between this case and the federal decisions preceeding [*sic*] it, on the one hand, and this bill, on the other, is that the former all involve *prosecutorial*

bill was subsequently amended to insert "substantially" before "material or probative" and to delete the proposed subdivision (d) incorporating the "harmless beyond a reasonable doubt" standard.[7] As so amended Assembly Bill No. 48 was enacted as chapter 1047 of the 1975 Statutes in September 1975.

The Attorney General urges the Legislature's rejection of the "harmless beyond a reasonable doubt" standard clearly indicates its intention not to modify or eliminate the requirement of the preexisting law that the petitioner show the false evidence might have affected the outcome of the trial. We are not certain the intention of the Legislature in this regard is thus rendered completely clear, but we agree the conclusion urged by the Attorney General is indicated, particularly in view of the statement in the Senate Committee on Judiciary's analysis that enactment of the "harmless beyond a reasonable doubt" provision would clearly constitute "a liberalization of existing law." The only part of the existing law that could have been liberalized by enactment of the "harmless beyond a reasonable doubt" provision was the requirement found in both *In re Imbler* and *Napue* v. *Illinois,* that the petitioner show the false evidence may have affected the outcome of the trial. If the Legislature believed, as it was informed, that enactment of the "harmless beyond a reasonable doubt" provision would change the preexisting rule, it follows it must also have believed and intended that its deletion of that provision would leave the preexisting rule intact.[8]

*misconduct,* while, under the bill, the reasonable doubt standard would apply *whether or not* use of false evidence by the prosecution had been knowing, negligent, inadvertent, or *totally without fault.*

"7. This bill would require only that the false evidence have been 'material or probative,' to support a petition for habeas corpus. The *Ruthford* case, discussed above at Comment 6, required the defendant, where the prosecution has suppressed evidence, to show that the evidence was 'substantially material.'

"This bill, therefore, requires a *lesser* showing by the defendant despite the *absence* of prosecutorial misconduct, than the *Ruthford* case required where prosecutorial misconduct is *present.*" (Original italics.)

[7]The amendment also substituted a new subdivision (d): "Nothing in this section shall be construed ·as limiting the grounds for which a writ of habeas corpus may be prosecuted or as precluding the use of any other remedies." This provision is not material to the decision at hand.

[8]Whether the statement in the analysis about "a liberalization of the existing law" was in fact correct is of no great consequence; it is what the Legislature was informed and presumably believed that is significant. However, as shall subsequently appear, the requirement that the false evidence be such as may have affected the outcome of the trial is a materiality requirement, whereas the "harmless beyond a reasonable doubt" standard is generally said to be applicable to the problem of prejudice. (See, e.g., *People* v. *Ruthford, supra,* 14 Cal.3d at p. 408.) Although the concepts of materiality and prejudice are obviously related and may be overlapping, it may be theoretically possible

That this was the intention of the Legislature is also supported by the amendment inserting the word "substantially" in front of the words "material or probative." In view of the statements in the Senate Committee on Judiciary's analysis (see fn. 6, *ante* [pars. foll. No. 7]), it is clear that this change was intended to increase the materiality showing required to make it at least as great as the materiality showing required in the suppression of evidence cases. The California suppression of evidence case most informative on the problem of materiality is *In re Ferguson, supra,* 5 Cal.3d at pages 533-535. After a two-page discussion of materiality and an analysis of the suppressed evidence there involved, the court concluded that had the defense known of the evidence suppressed, "it is reasonably probable that it could have obtained a different verdict." (5 Cal.3d at p. 535.)[9] We think there is no substantive difference between "may have affected the outcome of the trial" and "reasonably probable that it could have obtained a different verdict."

The *Ferguson* materiality formulation takes on added significance when it is seen that the statutory language "substantially material" may

---

that both are applicable. For example, it might be concluded that the petitioner must show substantial materiality (the false evidence was such as may have affected the outcome of the trial) but that relief would nevertheless be denied upon a showing by the People of a lack of prejudice (the false evidence was harmless beyond a reasonable doubt). This appears to be the applicable procedure in California in suppression of evidence cases. The court in *People* v. *Ruthford, supra,* 14 Cal.3d at page 409, stated: "The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt." Our conclusion that the false testimony in the case at bench was not shown to be such as may have affected the outcome of the trial, renders unnecessary our consideration of whether relief might also be denied in an appropriate case upon a showing the false evidence was harmless beyond a reasonable doubt. A court faced with that question, of course, would have to deal with the fact that the provision incorporating that standard in the May 1, 1975, version of Assembly Bill No. 48 was subsequently deleted.

[9]In *Ruthford,* the quoted formulation was discussed, along with similar formulations from *Giglio* v. *United States,* 405 U.S. 150, 154 [31 L.Ed.2d 104, 108, 92 S.Ct. 763] ["could . . . in any reasonable likelihood have affected the judgment of the jury"] and *Napue* v. *Illinois, supra,* 360 U.S. at page 272 [3 L.Ed.2d at page 1223] ["may have had an effect on the outcome of the trial"] as being tests for prejudice. (14 Cal.3d at p. 408.) It is clear these formulations in fact relate to materiality. The formulation in *Ferguson* is the conclusion of a two-page discussion of materiality in which prejudice is not once mentioned. (5 Cal.3d at pp. 533-535.) The formulation in *Giglio* was expressly identified by the court as a test for materiality. (405 U.S. at p. 154 [31 L.Ed.2d at p. 108]; see also the materiality formulation used in perjury prosecutions discussed in *In re Imbler, supra,* 60 Cal.2d at pp. 564-565, fn. 2 [" 'could have probably influenced the tribunal before which the cause was being tried' "].) In any event, *Ruthford* did not purport to overrule any part of *Ferguson* and, as noted (see fn. 8, *ante*), expressly retained a requirement of "substantial materiality" which, as will appear, it borrowed from *Ferguson*.

be traced to that case. It is clear from the statements in the Senate Committee on Judiciary's analysis (see fn. 6, *ante* [pars. foll. No. 7]), and the ensuing amendment of Assembly Bill No. 48 that the word "substantially" was inserted in front of the words "material or probative" on the basis of *People* v. *Ruthford, supra,* which had then only recently been decided. The expressions "substantial material evidence," "material substantial evidence" and "substantial materiality" are found throughout the *Ruthford* opinion. (14 Cal.3d at pp. 406, 408, 409.) The first use of any such expression is found in the statement: "In *Ferguson* we imposed a stricter duty upon prosecutors by requiring them to disclose substantial material evidence favorable to the accused without request. Furthermore, *Brady* and *Ferguson* indicate that either intentional or negligent prosecutorial suppression of substantial material evidence favorable to the accused denies to the defendant a fair trial and requires reversal." (14 Cal.3d at pp. 405-406 [citing *Brady* v. *Maryland,* 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] and *In re Ferguson, supra,* 5 Cal.3d 525].) The expression "substantial material evidence" is not found in *Brady.*[10] However, it does appear in *Ferguson*: "Although a request for production of evidence may be a factor to consider in determining a charge of suppression of evidence, we have recognized that 'in some circumstances the prosecution must, without request, disclose *substantial material evidence* favorable to the accused.'" (5 Cal.3d at p. 532; italics added.)[11] On the following page the *Ferguson* court quoted from a concession of the Attorney General referring to evidence that is "'substantial, material, and favorable to the defense.'" (5 Cal.3d at p. 533.) There immediately follows the previously mentioned two-page discussion and evaluation of the materiality of the evidence found to be suppressed (5 Cal.3d at pp. 533-535) terminating with the previously quoted conclusion of the court that had the defense known of the suppressed evidence, "it is reasonably probable that it could have obtained a different verdict." Thus, it is clear that in the view of the

---

[10]In *Brady* the court expressed its holding as follows: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. at p. 87 [10 L.Ed.2d at p. 218].)

[11]For the quoted proposition *Ferguson* cites *In re Lessard,* 62 Cal.2d 497, 509 [42 Cal.Rptr. 583, 399 P.2d 39]. *Lessard* did use the expression "substantial material evidence" on both pages 509 and 510. The expression "substantial materiality" was also used at page 510. Curiously enough, *Lessard* appears to have borrowed the expression "substantial material evidence" from the court's discussion of the suppression of evidence in *In re Imbler, supra,* 60 Cal.2d at page 569. (62 Cal.2d at p. 509.) *Imbler* cited no authority for its use of the expression, and we have been unable to trace its source further.

*Ferguson* court, "substantial material evidence" meant evidence of such significance that with reasonable probability it could have affected the outcome of the trial. (See also 5 Cal.3d at p. 533 [". . . other defense evidence which might have caused a different verdict."].) As we have already observed, we perceive no substantive difference between the formulations "reasonably probable that it could have obtained a different verdict" and "may have affected the outcome of the trial." Accordingly, we conclude the statutory language "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment" means false evidence of such significance that it may have affected the outcome of the trial.

The question remains whether petitioner has made the requisite showing. In considering that question it is essential to have clearly in mind what the false evidence was. Here again, petitioner fails to distinguish sufficiently between false evidence and newly discovered evidence. He refers not only to the evidence that Mary R. had sexual intercourse with three men other than Frank DeMarte, which she denied at trial, but also the evidence that Mary and several of the men had gonorrhea and that Mary was able to purchase pills at work. At trial no question was asked Mary concerning anybody's having gonorrhea or her ability to purchase pills at work.[12] There was no false testimony at trial relating to these matters. The evidence subsequently developed by petitioner constitutes newly discovered evidence and has been fully considered under that head.[13]

[12]Petitioner's reference to this evidence as having been concealed or suppressed by Mary is unwarranted by the record.

[13]Petitioner asserts he discovered the evidence relating to venereal disease and Mary's ability to purchase pills at work during his investigation of the false testimony concerning her sexual relations with other men. He then cites *In re Ferguson, supra,* 5 Cal.3d at page 533 for the proposition that, where prosecutorial suppression of evidence has occurred, consideration is given not only to the evidence which was actually suppressed but also to evidence discovered as the result of disclosure of the suppressed evidence. The point is without consequence, for we have given full consideration to this evidence under the head of newly discovered evidence. As we there indicated, the evidence that Mary had said on one or more occasions that she had purchased pills at work is of only slight probative value, if any, and the evidence that she and several of her male acquaintances had gonorrhea at the same time is barely material, if material at all, and completely without probative value on the crucial issue of prostitution.

We observe, however, that the situation in the case at bench is not essentially the same at that in *Ferguson*. Here, petitioner was not precluded from discovering the evidence relating to venereal disease and Mary's purchase of pills at work by the fact that Mary gave false testimony at trial. Larry Reynolds from whom came much of the information about the venereal disease and all of the evidence relating to Mary's ability to purchase pills at work had not left the area and was living in Pomona at the time of trial. Petitioner's attorney knew of his existence and of his connection with the case as is

The only false evidence was Mary's testimony that other than with Frank DeMarte she had not had sexual relations with any man not her husband, that she had not had sexual intercourse with Larry Reynolds, Douglas Seibert or Jim Newlin and, in that connection, that she had not stayed overnight at the apartment of Jim Newlin and, possibly, that Larry Reynolds did not move into the Angela Street apartment until she moved out.

Petitioner's contention that this false testimony was of such significance that it may have affected the outcome of his trial is based largely on the fundamental misconception that it is probative on the issue of prostitution. He repeatedly asserts that the evidence Mary had sexual intercourse with these men substantiates his defense that what occurred was not rape but an act of prostitution. As we have previously explained, however, the fact that Mary had consensual sexual intercourse with three male acquaintances in addition to Frank DeMarte over a relatively brief span of time simply does not give rise to an inference that she was a prostitute or that she committed an act of prostitution on the night of May 2, 1972. Indeed, as we have seen, this evidence would not even be admissible as substantive evidence in a new trial. (Evid. Code, § 1103, subd. (2)(a).) We conclude, therefore, that on a substantive basis this evidence was not such as may have affected the outcome of petitioner's trial.

Petitioner is correct, however, that introduction of evidence that Mary had sexual intercourse with Reynolds, Newlin and Seibert, that she had stayed overnight at Newlin's apartment and that Reynolds moved into the Angela Street apartment prior to Mary's moving out would have borne on Mary's credibility. ■■ And we have no doubt that in appropriate circumstances false testimony bearing on the credibility of a key prosecution witness may constitute "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment" within the meaning of Penal Code section 1473, subdivision (b)(1).[14] (See *In re*

---

evidenced by the fact he asked Mary at trial if she had not had sexual relations with Larry Reynolds. Indeed, it appears the fact that Mary had had sexual relations with Seibert and Newlin came as no surprise, for Mary was specifically asked by defense counsel at trial if she had not had sexual relations with these two individuals and hearsay evidence was introduced at the *Ballard* motion hearing indicating she had had sexual relations with a number of men other than her husband Frank DeMarte. (See discussion, *infra*.)

[14]We think it probable the statutory language "on the issue of guilt or punishment" had its source in the language of the court in *Brady* v. *Maryland, supra,* 373 U.S. at page 87 [10 L.Ed.2d at page 218], "is material either to guilt or to punishment. . . ." (See fn. 10,

*Imbler, supra,* 60 Cal.2d at pp. 564-565; cf. *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [31 L.Ed.2d at p. 108]; *Napue* v. *Illinois, supra,* 360 U.S. at pp. 269, 270 [3 L.Ed.2d at p. 1221]; *People* v. *Ruthford, supra,* 14 Cal.3d at pp. 407-408.) ▮ The question is, therefore, whether it is reasonably probable the evidence that Mary had sexual intercourse with Reynolds, Newlin and Seibert, that she had in fact stayed overnight at Newlin's apartment, and that Reynolds moved into the Angela Street apartment before she moved out could have had such an effect on Mary's credibility as to produce a verdict of not guilty. We believe not.

Petitioner characterizes the trial as nothing more than a contest of credibility between Mary and him. Certainly it must be said Mary was a key prosecution witness and the question of credibility was vital, but petitioner's characterization of the trial is not entirely accurate. There was rather strong circumstantial evidence of petitioner's guilt. The fact that petitioner was armed with a .45 automatic at the time of the alleged act of prostitution did not help his cause. His explanation for having the gun with him, that he had some doubts what he might be getting involved in, was somewhat less than convincing, particularly in light of his attempt to dispose of the weapon by throwing it out the door of his vehicle when he saw police cars. The false statements he originally made to the police that he did not have a gun and had not been with a woman that night did not help him. Nor was his case strengthened by the fact the act of sexual intercourse claimed to be an act of prostitution took place in the bushes against the wall of the armory when nearby petitioner had an unoccupied hotel room.[15]

In addition, the jury was well aware that Mary was no paragon of virtue. She admitted that while still married she had had sexual relations with Frank DeMarte and that she frequently used seconal and amphetamines. There was much evidence concerning her group living arrangement. The judge that presided at the evidentiary hearing opined that it would not have come as any great shock to the jury that Mary had sexual relations with three male acquaintances other than DeMarte, and we agree.[16]

---

*ante.*) In *Brady* the suppressed evidence related to the issue of punishment, but the holding of *Brady* is applied also to evidence bearing on the credibility of a key prosecution witness. (*Giglio* v. *United States, supra,* 405 U.S. at pp. 153-154 [31 L.Ed.2d at p. 108].)

[15]At trial petitioner explained this fact by testifying he suggested that Mary and he go to the hotel room but that Mary declined saying she did not have time.

[16]In fact, the district attorney at trial argued to the jury: "Even if I were to say that she is much worse than she is, if I were to condemn her entirely as a person that is running

■ Petitioner incorrectly contends that in testing the false evidence for substantial materiality, "a reviewing court need not look to what other evidence of untainted nature might be available to arguably support the conviction. . . ." On the contrary, in assessing whether the false testimony was of such significance it may have affected the outcome of the trial, it is necessary to consider all of the evidence and circumstances in the case. "In considering the materiality of the evidence, we must look to the entire record because materiality can only be determined in the light of the circumstances. Thus we must consider not only the other evidence of guilt but also any other defense evidence which might have caused a different verdict." (*In re Ferguson, supra,* 5 Cal.3d at p. 533; see also *People* v. *Ruthford, supra,* 14 Cal.3d at p. 410.)

We think it not impertinent to observe also that were petitioner granted a new trial, unless the prosecution first elicited evidence of Mary's sexual conduct, which seems unlikely, petitioner's evidence that Mary had sexual intercourse with these men would not be admissible for impeachment purposes. Unless its probative value would be outweighed by its prejudicial effect, evidence of a complaining witness' sexual conduct may be admissible in a rape case to impeach the complaining witness under certain circumstances and by following a statutorily prescribed procedure. (Evid. Code, §§ 780, 782, 1103, subd. (2)(d); see *People* v. *Blackburn, supra,* 56 Cal.App.3d at p. 691.) However, before the statutory provisions have any possible application, there must be testimony by the complaining witness that would be impeached by evidence of her sexual conduct. (See *People* v. *Blackburn, supra,* 56 Cal.App.3d at p. 693.) As we have seen, the fact that Mary had sexual intercourse with three male acquaintances in addition to DeMarte is not probative on the issue of prostitution and would not tend to discredit Mary's testimony that she did not commit an act of prostitution on the night of May 2. It could not therefore be introduced for impeachment of that testimony. Since, as we have explained, petitioner would be precluded by Evidence Code section 1103, subdivision (2)(a) from questioning Mary about her sexual conduct other than with defendant for substantive purposes and since it is most unlikely the prosecution would adduce evidence of Mary's sexual conduct, it is almost a certainty there would be no testimony that this new evidence would tend to impeach.

---

around from flower to flower, man to man, giving each one of them venereal disease as she goes, that still would not make her a prostitute in the context of the attack on her character that Mr. Youngquist [defense counsel] has put before you."

■

Petitioner urges the false testimony shown here is as substantially material as the false testimony in *Imbler* and the evidence suppressed in *Ferguson*. In attempting to determine whether the false evidence was such as may have affected the outcome of the trial, it is not greatly helpful to attempt to compare the false evidence or suppressed evidence in different cases, for, as previously indicated, that determination depends upon an evaluation of the facts, circumstances and all the evidence in each case. In any event, petitioner's argument is not persuasive.

In *Imbler*, the petitioner had been convicted of first degree murder and sentenced to death. He asserted that Costello, one of several witnesses who at trial identified him as the perpetrator, gave perjured testimony in identifying him, in admitting only one felony conviction when in fact he had suffered two and, in an attempt to bolster his credibility, in testifying that following his release from state mental hospitals to which he had been committed, he had received degrees from the University of California and the University of Southern California. On the basis of the evidence at a reference hearing, the court found Costello's trial testimony that he had received two college degrees after being released from the state mental hospitals was false. It determined that Costello's identification testimony was not perjured, though at the reference hearing he testified he could not identify petitioner as the perpetrator of the crime. With respect to the false testimony about receiving college degrees, the court acknowledged that false testimony affecting a witness' credibility might require that the conviction be overturned "if it might have affected the outcome of the trial." (60 Cal.2d at pp. 564-565.) But it did not attempt to determine whether the false testimony might have affected the outcome of the trial. It held that petitioner "failed to prove knowledge of these falsehoods by representatives of the state" as was then required. (60 Cal.2d at p. 565.) Accordingly, the petitioner was denied relief. Obviously, *Imbler* does not aid petitioner. The court did not reach the question whether the false evidence might have affected the outcome of the trial, and relief was denied in that case.

*Ferguson*, as we have previously pointed out, involved what the court found to be prosecutorial suppression of evidence. The petitioner in that case had been convicted of kidnaping Mr. and Mrs. Miller and of six sexual offenses against Mrs. Miller, including rape and oral copulation. He claimed that as he was driving he was flagged down by Mr. Miller, that he picked the Millers up, that Mr. Miller offered Mrs. Miller to him

for the four or five dollars he had and that after a brief discussion between Mr. and Mrs. Miller, Mrs. Miller agreed to go with him, whereupon Mr. Miller left petitioner's car and petitioner and Mrs. Miller drove to an orange grove where several sexual acts occurred. Although Mrs. Miller was permitted to testify at trial, it was shown she could not read or write, did not know her address, did not know in which year or which state she was born, did not know what it meant to swear to tell the truth and did not know what an oath was. The evidence suppressed was Mr. Miller's arrest record which would have shown 37 entries including a felony conviction and commitments to state hospitals as a sex degenerate and a psychotic. Indicating that Mr. Miller's felony conviction would have been admissible to impeach his credibility and that much of the other information contained in the arrest record would have constituted admissible evidence under Evidence Code section 1103 as it then read[17] and would have been highly probative on the issue of guilt, the court concluded that had the defense known of the suppressed evidence, it was reasonably probable it could have obtained a different verdict. By contrast, in the case at bench, as we have several times pointed out, the fact that Mary had consensual sexual relations with three of her male acquaintances in addition to DeMarte is not probative on the crucial issue of prostitution, would not seriously have impaired the credibility of her trial testimony and, in a new trial, would not even be admissible evidence.

Finally, petitioner contends that had Mary testified truthfully at the renewed *Ballard* motion and admitted she had sexual relations not only with DeMarte but also with Reynolds, Newlin and Seibert, the trial court might have granted petitioner's motion for a psychiatric examination of Mary and, thus, her false testimony may have affected the outcome of his trial. Of course, neither petitioner nor we have any way of knowing or even guessing what such a psychiatric examination would have disclosed or what testimony the examiner might have given. It is entirely possible that petitioner would not have been helped in the least. In any event, even assuming a different ruling on the *Ballard* motion would satisfy the "substantially material" requirement, we find it inconceivable the evidence that Mary had sexual intercourse not only with DeMarte but also with Reynolds, Newlin and Seibert might have changed the ruling on the *Ballard* motion.

---

[17]*Ferguson* was decided in 1971 prior to the 1974 amendment of Evidence Code section 1103 making the complaining witness' sexual conduct generally inadmissible in a prosecution for rape.

Petitioner asserts the judge presiding at the evidentiary hearing acknowledged the ruling on the *Ballard* motion might have been different. If he did, we do not agree with him. However, we do not so read the record. Counsel for petitioner asserted, "the Court might have ruled otherwise had the testimony been honest at the time, your Honor." The judge responded dubiously: "Well, they [*sic*] might have."

Prior to the renewed *Ballard* motion hearing, Mary had already testified about having sexual relations with Frank DeMarte and about her group living arrangement. At the hearing on the renewed motion, she testified she took seconal and would get "loaded" on it mostly on weekends. She testified that at the time of the rape she had been taking "reds" approximately two years but had stopped using them at the end of the summer of 1972. She felt they affected her moods, her outlook on life and caused her depression and anger. Pamela Lane Wallace was one of several additional witnesses at the hearing on the renewed *Ballard* motion. She testified she was one of the group living in the apartment, that she had seen Mary take seconal frequently and that she and Mary used to get "loaded" together. While they were living at the apartment, approximately 15 people a day would come by and many of them would get "loaded" and sleep there. She described it as a "flophouse." With respect to Mary's reputation for chastity, she testified that Douglas Seibert had said: "Mary's loving sure is good"; Sid Langerman had said: "Yes, I went to bed with her"; and Richard Kilgore told her that "he had been to bed with Mary."

At the conclusion of the hearing on the renewed motion, the trial judge stated: ". . . I watched with particular interest the development of any evidence that might indicate to the Court some psychological problem on the part of the complaining witness. [¶] The Court certainly doesn't condone her mode of living over the past year or so and I certainly don't approve of the mores of her particular society. [¶] On the other hand, I have not observed anything that would cause me to suspicion [*sic*] that there is some type of mental defect or deficiency that would prevent her from relating to the best of her ability the events involved in this case."

As the trial court correctly indicated, the question presented by the renewed *Ballard* motion was whether it appeared Mary had an emotional or mental condition that might affect her credibility. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 174-175 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Russel,* 69 Cal.2d 187, 195 [70 Cal.Rptr. 210,

443 P.2d 794].) He found no such emotional or mental condition and, accordingly, denied the motion for psychiatric examination. The testimony of Pamela Wallace included hearsay statements indicating Mary had had sexual relations with a number of men other than Frank DeMarte. The comments of the court indicate it understood the testimony but that it was not concerned with Mary's "mode of living over the past year or so" or "the mores of her particular society" but, rather, whether she had some emotional or mental condition that might affect her credibility. Finding none, it denied petitioner's motion. In view of the evidence given at the hearing on the renewed motion and the court's comments, there is no reasonable possibility, much less probability, the ruling would have been different had Mary admitted having sexual relations with Reynolds, Newlin and Seibert.

We conclude the false testimony proved by petitioner was not of such significance that it may have affected the outcome of his trial and, thus, that it was not "substantially material or probative" within the meaning of Penal Code section 1473, subdivision (b)(1).

The petition for habeas corpus is denied.

Gardner, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied April 4, 1978, and petitioner's application for a hearing by the Supreme Court was denied May 25, 1978. Mosk, J., was of the opinion that the application should be granted.