Filed 12/3/12

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |
|---|---|
| ) | |
| ) | |
| ) | S189275 |
| ) | |
| In re WILLIAM RICHARDS ) | |
| ) | Ct.App. 4/2 E049135 |
| on Habeas Corpus. ) | |
| ) | San Bernardino County |
| ) | Super. Ct. No. SWHSS700444 |
| _____ ) | |

At petitioner's 1997 trial for the murder of his wife, the evidence against him was circumstantial. One of many pieces of evidence linking petitioner to the crime was a postmortem photograph of the victim's hand, depicting an indistinct, crescent-shaped lesion. The prosecution's dental expert stated his opinion that the lesion was a human bite mark. And after comparing the bite mark to the distinctive arrangement of petitioner's lower teeth, the dental expert stated that petitioner's unusual dentition was consistent with the shape of the mark depicted in the photograph, and that he could not exclude petitioner's teeth as a possible source of the mark. According to the expert, petitioner's unusual dentition occurred in only 2 percent or less of the general population. The jury found petitioner guilty as charged. The Court of Appeal upheld the conviction.

In 2007, petitioner sought habeas corpus relief in the San Bernardino County Superior Court, claiming that new evidence established his innocence, and that his murder conviction was based on false evidence given at trial by the prosecution's dental expert. In a declaration supporting the petition, that expert

1

stated that his trial testimony regarding the statistical frequency of petitioner's dentition was not based on scientific data. Moreover, after examining photographs depicting other lesions on the victim's body, the dental expert said he was no longer certain that the lesion on the victim's hand was a bite mark.

Supporting declarations by other dental experts agreed, based on newly available computer technology, that the prosecution's expert had testified inaccurately at trial.

The superior court issued an order to show cause. After an evidentiary hearing, the court granted habeas corpus relief; in the court's view, petitioner had presented new evidence pointing unerringly to his innocence. The Court of Appeal disagreed. We granted petitioner's request for review.

The most significant issue here is whether a conviction is based on "false evidence" (Pen. Code, § 1473, subd. (b)) when it depends in part on the opinion of an expert witness, and posttrial advances in technology have raised doubts about the expert's trial testimony without conclusively proving that testimony to be untrue. We conclude that in such circumstances the expert's trial testimony has not been shown to be "false evidence," but that the information garnered from the technological advances may be presented as newly discovered evidence in support of habeas corpus relief. Habeas corpus relief should be granted only if the new evidence " 'point[s] unerringly to innocence or reduced culpability' " (*In re Clark* (1993) 5 Cal.4th 750, 766), a showing that petitioner here has not made.

## I

### A. Murder of Pamela Richards

Petitioner and his wife, Pamela, lived in a camper parked on their property in a remote area of San Bernardino County. They used a generator, kept in a small

shed, for electricity. To access their home, one had to ascend a steep sand and gravel driveway. The couple kept several dogs on the property to ward off uninvited intruders; they also had several guns, which Pamela knew how to use.

At approximately 11:55 p.m. on August 10, 1993, Eugene Price telephoned the couple's camper in response to a message Pamela had left on his answering machine around 7:00 or 7:30 that evening. Price had a sexual relationship with Pamela, who was planning to move with Price to an apartment in Ventura County. Petitioner answered the telephone call. He sounded stressed and agitated. When Price asked for Pamela, petitioner said she was dead. Price told petitioner to call 911. At 11:58 p.m., petitioner did so.

Because of the remote location of the property, San Bernardino Sheriff's Deputy Mark Nourse did not arrive until shortly after 12:30 a.m. He testified that the property was "pitch black," there were no lights, and there was no moonlight. Petitioner, who was dressed in blue jeans and a blue work shirt, gave this story: He had left work at 11:00 p.m. and arrived at the camper just before midnight. The generator was off when he arrived. The property was dark. The battery in the camper had lost its charge. He did not turn on the generator, and he had no light. He found his wife lying on the ground outside the camper. It was hard for him to see her body in the dark, but he realized she was dead when he rolled her over. He immediately called 911 and then cradled her head in his arms.

Deputy Nourse also said that although it was an overcast night and very dark, and although only half an hour had transpired between petitioner's reported arrival at his property and Nourse's arrival there, petitioner was able to take the deputy on a detailed tour of the crime scene. Petitioner knew that Pamela's pants were lying next to the generator, and that they had not come off easily, telling the deputy "trust me on this." He knew that her underwear was inside the camper. He knew that her blood was inside the camper on the pillow. He knew that there was

3

"blood on rocks up against the hill" (referring to the rough, upward-sloping terrain to the southwest of the crime scene). He knew that a bloodstained paving stone had been thrown "over the side of the hill" (referring to the rough, downward-sloping terrain to the north of the crime scene). He theorized about what Pamela was doing when her murderer arrived, where the murderer confronted Pamela, and what she did in her defense. And he surmised that the murderer had used a cinderblock to kill Pamela. He also told the deputy: "[A]ll the evidence that relates to this case I already touched and moved trying to figure out how this whole thing happened."

Deputy Nourse described petitioner's demeanor as "very calm, cool, [and] collected," but occasionally petitioner would fall to his knees crying, after which he would get back up and continue talking. To the deputy, it seemed as if petitioner was speaking "like he had rehearsed or was reading from a script." Petitioner's dogs barked, growled, and snarled at Deputy Nourse. Petitioner remarked that the dogs had failed to protect his wife from her murderer. He did not report anything missing from the premises.

Deputy Nourse checked Pamela's body. It was neither warm nor cold. Her arm was pliable. Her blood was still wet, bright red, and in a puddle; it had not coagulated or soaked into the sandy soil. She appeared to have just died.

Sheriff's investigators secured the crime scene. In the morning, they conducted a thorough investigation. Pamela was lying on her back on the ground outside the camper, covered with a sleeping bag. She was naked from the waist down, except for her socks. Her head was crushed, an eye hanging out. A bloody cinderblock was lying near her head, and blood spatters were on the ground. Petitioner had scattered bloodstains on his pants and shoes. From a study of all the footprints and tire tracks that were discernible in the soft sand and gravel, it did

not appear that anyone had been present except petitioner, Pamela, and the investigators.

Investigators found a note in Pamela's purse in which petitioner proposed a division of their assets and personal property. Petitioner and his wife had been having financial and marital difficulties, and both had sexual relationships outside the marriage.

DNA testing established that the bloodstains on petitioner's pants and shoes belonged to Pamela. A criminalist determined that the stains were from blood spatter, not from drips or contact, indicating that the blood hit petitioner's pants and shoes when Pamela's skull was smashed.

An autopsy determined that Pamela had been strangled. The strangling was sufficient by itself to cause her death. In addition, her skull was smashed. That injury was also sufficient to cause her death. There was no evidence of sexual assault.

The pathologist who performed the autopsy severed some of Pamela's fingertips from her body for testing. Daniel Gregonis, a criminalist, later examined the severed fingertips under a stereomicroscope and noticed blue cotton fibers wedged deep in a crack of a broken fingernail. A broken fragment apparently torn from the same fingernail was found on the ground at the crime scene, suggesting that the fingernail broke during Pamela's struggle with her assailant. The criminalist examined the blue cotton shirt petitioner wore on the night of the murder, and he concluded that the blue shirt fibers were indistinguishable from the fibers caught in the crack in Pamela's broken fingernail. The same fibers were not, however, mentioned in the report of Craig Ogino, another criminalist who testified for the prosecution at trial and who may have examined the same fingertips.

The time clock at petitioner's work indicated that he had left there at 11:03 p.m. on the night of the murder. A few weeks after Pamela's murder, a sheriff's homicide investigator went to petitioner's place of employment. The investigator left petitioner's workplace at 11:03 p.m., walked to his car, and then drove at the speed of traffic (60-70 miles per hour). He arrived at petitioner's residence at 11:47 p.m. If on the night of the murder petitioner also arrived home at 11:47 p.m., then he had been at home for 11 minutes when he called 911.

A homicide detective interviewed petitioner on several occasions after Pamela's murder. Petitioner's statements were generally consistent with what he had earlier told Deputy Nourse, who responded to petitioner's 911 call.

**B. Petitioner's Trial and Conviction**

Petitioner was charged with murder. (Pen. Code, § 187.) His first trial ended in a mistrial after the jury was unable to reach a verdict. His second trial was aborted before a jury was selected, when the trial court recused itself. His third trial, like his first, ended in a mistrial after the jury could not reach a verdict.

At petitioner's fourth trial, the prosecution presented the evidence described in part I.A., *ante*. In addition, the prosecution for the first time presented expert testimony by a forensic dentist, Dr. Norman D. Sperber. Dr. Sperber described a unique feature of petitioner's lower teeth: The lower right canine tooth was out of alignment with the other teeth and had not emerged fully from the gum. Dr. Sperber testified, based solely on his experience as a practicing dentist, and expressly without the benefit of any scientific studies, that "it might be one or two or less" out of a hundred people who would have petitioner's dental irregularity. After visually comparing a photograph of an indistinct crescent-shaped lesion on murder victim Pamela's hand to a model of petitioner's lower teeth, Dr. Sperber stated his opinion that the lesion was a human bite mark, and that petitioner's

unusual dentition was "consistent with" the bite mark. In the photograph, the lesion appears only as a reddening and bruising of the surface tissues; Pamela's skin is not broken, and it is difficult to identify individual marks that might be teeth marks.

The defense at trial presented testimony from several witnesses who said that both petitioner and Pamela seemed "fine" and "normal" on the day of the murder, although Pamela's brother testified that Pamela had told him she and petitioner had been arguing.

In addition, the defense presented evidence that Pamela had already been dead for some time when petitioner arrived home on the night of the murder. Dr. Griffith Thomas, a forensic pathologist, testified about the factors from which the time of death can be determined. In his view, the time of Pamela's death was uncertain, but many of her contusions occurred several hours before she died.

In regard to the supposed bite mark on Pamela's hand, Dr. Gregory S. Golden, an expert in forensic dentistry, testified for the defense that in a brief review of 15 "study models" of teeth in his office, he found five models that were "consistent with" the mark. In his view, the bite-mark evidence was inconclusive and should be disregarded, in part because of the angular distortion in the photograph of the mark. On cross-examination, Dr. Golden agreed with Dr. Sperber's estimate that petitioner's displaced canine tooth occurred in only about 2 percent of the general population.

Finally, defense witness Dean M. Gialamas, a senior criminalist with the Los Angeles County Sheriff's Department, testified that the scattered bloodstains on the clothes petitioner was wearing on the night of Pamela's murder were contact stains, not spatter stains, and they were more consistent with petitioner's story that he cradled Pamela's dead body than with the prosecution's theory that petitioner was the killer.

7

The jury found petitioner guilty of first degree murder of his wife, Pamela. (Pen. Code, § 187, subd. (a).) The trial court sentenced petitioner to 25 years to life in state prison. The judgment was affirmed by the Court of Appeal.

## C. Habeas Corpus Proceeding

In 2007, petitioner sought habeas corpus relief in the San Bernardino County Superior Court, asserting that his 1997 murder conviction was based on false evidence, and that new evidence unerringly established his innocence. Among the voluminous exhibits supporting the petition was a declaration from Forensic Dentist Sperber, discussing his statement at trial that only 1 or 2 percent of the population had petitioner's dental irregularity. Dr. Sperber's declaration stated: "These percentages were based on my own experience and were not scientifically accurate." Concerning the lesion on murder victim Pamela's hand, the declaration added: "With the benefit of all of the photographs [of the crime scene and Pamela's injuries], and with my added experience, I would not now testify as I did in 1997," and "I cannot now say with certainty that the injury on the victim's hand is a human bite mark injury."

Also supporting the petition were declarations and reports by other experts in forensic dentistry. The declaration of Dr. Golden, who had testified for the defense at trial, said that he had "enlarged the image [of murder victim Pamela's hand lesion] to life-size," and that after comparing the enlarged image to petitioner's teeth, he "would tend to exclude [petitioner] as the suspected biter." The declaration of Dr. Charles M. Bowers described the process by which he and Dr. Raymond J. Johansen had removed angular distortion from the photograph of Pamela's hand lesion, thereby permitting a more accurate comparison between the hand lesion and petitioner's lower teeth. According to Dr. Bowers, "[t]he new scientific methods demonstrably contradict the conclusion at trial that [petitioner]

8

could not be ruled out as a suspected biter." Dr. Bowers also criticized the methodology used by Dr. Sperber at petitioner's trial. In an earlier written report, Dr. Bowers said that there is "significant doubt that the hand injury is even a bitemark."

The superior court issued an order to show cause and held an evidentiary hearing on the habeas corpus petition. The court heard testimony from Dr. Sperber (the prosecution's forensic dentistry witness at trial) and from the other dental experts who had submitted declarations and reports in support of habeas corpus relief. Dr. Sperber discussed the points he had made in his posttrial declaration. He also described the angular distortion in the photograph of the lesion on Pamela's hand, and he examined photographs depicting other lesions on Pamela's body. Referring to the photograph of the lesion on Pamela's hand, he said: "I don't know for sure that . . . that photograph depicts a bite mark." Dr. Sperber added: "My opinion today is that [petitioner's] teeth . . . are not consistent with the lesion on the hand." Dr. Golden likewise confirmed the points he had made in his declaration. He also described the availability of new computer technology allowing him to remove angular distortion from photographs. He concluded that the lesion on Pamela's hand might have been from a dog bite or some other source; in any case, he "would tend to rule out Mr. Richards . . . as the suspected biter."

Drs. Bowers and Johansen testified in detail about the process by which they digitally altered the photograph of Pamela's hand to remove angular distortion. Drs. Bowers and Johansen, experts in this process, have published articles and a book describing the use of this process in forensic dentistry. The technique was first used in 1996 or 1997 by a single dentist in Canada, after which Drs. Bowers and Johansen further developed the technique, which has since become accepted in the field of forensic dentistry.

9

Dr. Johansen said that he removed the angular distortion from the photograph of Pamela's hand and then compared the corrected photograph to "overlays" depicting petitioner's lower and upper teeth. He also examined photographs of wire-mesh fencing material found on the ground near Pamela's body. He concluded that petitioner's lower teeth did not match the lesion on Pamela's hand. The upper teeth matched the lesion in some places, but not others. Dr. Johansen could not exclude petitioner's teeth as a *possible* source of the lesion, but in his opinion it was just as likely that the indistinct lesion was caused by the fencing material as it was by petitioner's teeth. But Dr. Johansen conceded on cross-examination that he had removed angular distortion from the same photograph in 2000, concluding *at that time* that the lesion was a human bite mark that was consistent with petitioner's teeth.

Dr. Bowers testified that he likewise removed the angular distortion from the photograph of murder victim Pamela's hand and compared the corrected photograph to an "overlay" of petitioner's lower teeth. He found no match. After examining photographs of other lesions on Pamela's body, Dr. Bowers doubted whether the hand lesion was a human bite mark.

Other evidence presented in support of the habeas corpus petition indicated that the blue fibers found embedded in a crack of Pamela's broken fingernail might not have been present at the time of the autopsy. No blue fibers were visible in a still photograph that was taken during the autopsy, nor were they visible when the autopsy photograph was digitally altered to increase color saturation. By contrast, the blue fibers were visible in a still photograph taken from a video recording of the postautopsy testing of Pamela's fingertips.

In addition, a two-centimeter-long hair was found under one of Pamela's long artificial fingernails. A new type of DNA testing revealed that this hair did not come from Pamela or from petitioner, and the district attorney did not dispute

10

those DNA test results. Patricia Zajac, a professor of criminal justice at California State University, East Bay and a criminalist, reviewed the laboratory notes and other records in the case. She testified that in her opinion the hair was not "historical," by which she meant that in her view its placement was somehow related to the violence that resulted in Pamela's death. Professor Zajac also testified that although the hair had a mature root and had fallen out naturally (or was ready to do so), that fact did not undermine her conclusion that the hair under Pamela's fingernail was related to the crime.

Finally, a new type of DNA testing indicated that the bloodstained paving stone that — along with a cinderblock — may have been used to smash Pamela's skull had trace DNA from one or more male persons, none of whom was petitioner. Pamela's DNA, however, was the primary DNA on the paving stone. The ratio of the male DNA to Pamela's DNA was 1 to 10 (in one location) and 1 to 6 (in another location). Again, the district attorney did not dispute those DNA test results. In addition, the male DNA was located on the paving stone in a place near where Daniel Gregonis, a criminalist in the sheriff's department, had earlier expected he might find the DNA of the murderer.

The district attorney called Gregonis as a witness. Gregonis and another criminalist, Craig Ogino, had examined "scrapings" from Pamela's fingernails. These scrapings included a dark animal hair and also the two-centimeter-long human hair that, according to petitioner's DNA testing, did not come from either Pamela or from petitioner. Because of the length of Pamela's artificial fingernails, Gregonis was of the view that the human hair might have been lodged under Pamela's fingernail for a long time without being noticed, and he therefore concluded that the hair might not have been related to the crime. The parties stipulated that criminalist Ogino would testify along similar lines.

11

Gregonis also discussed the male DNA found on the bloodstained paving stone that might have been used to kill Pamela. He said that the male DNA was present in an amount that was consistent with contamination that could have occurred in the courtroom, although it also could have been already present on the stone when the stone was stained with Pamela's blood.

The superior court granted habeas corpus relief, concluding that the new evidence pointed unerringly to petitioner's innocence. In reaching this conclusion, however, the superior court made very few specific findings of fact. The court ordered that petitioner be remanded for a new trial, but it stayed its decision for 15 court days to allow the district attorney to appeal.

To preserve the status quo, the Court of Appeal stayed proceedings to retry petitioner. After briefing and oral argument, the Court of Appeal vacated the superior court's order granting the petition for a writ of habeas corpus. With regard to petitioner's false evidence claim (challenging the trial testimony of Dr. Sperber regarding the alleged bite mark), the Court of Appeal held that a habeas corpus petitioner does not establish false evidence under Penal Code section 1473's subdivision (b) merely by presenting new expert testimony on how to interpret the evidence offered at the trial. Accordingly, the Court of Appeal concluded that all petitioner's claims were, in effect, new evidence claims, and that the unerring innocence standard applicable to such claims therefore applied to all claims. The court reviewed the evidence that petitioner had offered in support of habeas corpus relief and concluded that petitioner's evidence failed to establish unerring innocence.

We granted petitioner's petition for review. His claims are addressed below.

12

## II

Penal Code section 1473, subdivision (b) provides in relevant part: "A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons: [¶] (1) *False evidence* that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration . . . ." (Italics added.) In addition, this court's decisions hold that habeas corpus relief is appropriate if the petitioner presents *new evidence* that unerringly establishes innocence. With regard to new evidence, we have said: "It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury. [Citations.] '[A] criminal judgment may be collaterally attacked on the basis of "newly discovered" evidence only if the "new" evidence casts fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, *must undermine the entire prosecution case and point unerringly to innocence or reduced culpability*.' [Citation.]" (*In re Clark*, *supra*, 5 Cal.4th at p. 766, italics added; see also *In re Lawley* (2008) 42 Cal.4th 1231, 1238-1241.) Here, petitioner asserts both theories of relief; that is, he asserts that his conviction was based on false evidence, and that new evidence unerringly establishes his innocence.

Our standard of review is de novo with respect to questions of law and the application of the law to the facts. We accept as final the superior court's resolution of pure questions of fact if they are supported by substantial evidence. (*In re Collins* (2001) 86 Cal.App.4th 1176, 1181.) Here, the superior court made very few specific findings of fact regarding the evidence, and none that is significant to the main part of our analysis. Accordingly, our review here is de novo.

## A. False Evidence

### 1. *Legal principles*

As noted, Penal Code section 1473's subdivision (b) provides for habeas corpus relief if "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration . . . ." Before 1975, it was much more difficult for a convict to obtain habeas corpus relief on false evidence grounds, requiring proof that the prosecution knowingly relied on perjured testimony. As explained by the Court of Appeal in *In re Wright* (1978) 78 Cal.App.3d 788 (*Wright*): "Prior to the 1975 amendment to Penal Code section 1473, the rule was clear that to obtain habeas corpus relief on the ground of perjured testimony, the petitioner was required to establish by a preponderance of the evidence: (1) that perjured testimony was adduced at his trial, (2) that this was known to a representative of the state, and (3) that the perjured testimony may have affected the outcome of the trial. (*In re Imbler* [(1963)] 60 Cal.2d [554,] 560; *Napue v. Illinois* [(1959)] 360 U.S. 264, 269, 272; see Witkin, Cal. Criminal Procedure (1975 supp.) § 804, p. 866.)" (*Wright*, at p. 807.)

The Court of Appeal in *Wright*, *supra*, 78 Cal.App.3d 788, related the key *changes* that the 1975 amendment had effected: "Under Penal Code section 1473, subdivision (b)(1) . . . , it is not required that perjury be proved. A showing of 'false evidence' is sufficient. Additionally, it is no longer necessary to show a representative of the state knew the testimony was false. (Pen. Code, § 1473, subd. (c).)" (*Wright*, at p. 809, fn. 5.) *Wright* relied on and quoted a committee analysis of the Assembly bill that led to the 1975 amendment to Penal Code section 1473: " 'The key distinction between [prior case law] . . . , on the one hand, and this bill, on the other, is that the former all involve *prosecutorial misconduct*, while, under the bill, the [proposed prejudice] standard would apply

14

*whether or not* use of false evidence by the prosecution had been knowing, negligent, inadvertent, or *totally without fault*.' " (*Wright*, at p. 810, fn. 6, original italics.)

The Court of Appeal in *Wright*, *supra*, 78 Cal.App.3d 788, also noted an important way in which the law remained *unchanged* after the 1975 amendment: "[T]he requirement under the preexisting law that the petitioner show the false evidence may have affected the outcome of his trial was *not* eliminated or changed by the 1975 amendment to Penal Code section 1473 and is still required for relief under the amended statute: '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment' means false evidence of such significance that it may have affected the outcome of the trial . . . ." (*Wright*, at pp. 808-809, italics added.) *Wright* further explained that this required showing of prejudice was the same as the "reasonably probable" test (see *People v. Watson* (1956) 46 Cal.2d 818, 836) that applies in other instances of state law error. (*Wright*, at p. 812.) As we said in *In re Roberts* (2003) 29 Cal.4th 726, 742: "False evidence is 'substantially material or probative' . . . 'if there is a "reasonable probability" that, had it not been introduced, the result would have been different. [Citation.]' [Citation.]"

Thus, under the present version of section 1473 it does not matter *why* evidence is false or *whether any party to the proceeding knew* it was false. So long as some piece of evidence at trial was actually false, and so long as it is reasonably probable that without that evidence the verdict would have been different, habeas corpus relief is appropriate.

We summarized those principles in *In re Hall* (1981) 30 Cal.3d 408, at page 424: "The new law requires only that the evidence be 'false' and 'substantially material or probative on the issue of guilt or punishment' ([Pen. Code, § 1473], subd. (b)(1)); there is no longer any obligation to show that the

15

testimony was perjured or that the prosecutor or his agents were aware of the impropriety. (*In re Wright*, *supra*, 78 Cal.App.3d 788, 807-808.) [¶] In this case, the trial testimony of [two key witnesses] identifying petitioner as the killer apparently was false, *albeit unintentionally so*. As it was virtually the only damning evidence against petitioner, that testimony clearly satisfies the statute's test of materiality. Accordingly, . . . we hold that false evidence was introduced against petitioner, and that issuance of the writ is justified on that ground . . . ." (Italics added.)

### 2. *Expert opinion testimony*

Here, we consider how to apply the above discussed principles in the context of an expert witness's *opinion* testimony. Expert opinion is qualitatively different from eyewitness testimony and from physical evidence. Expert witnesses are by definition witnesses with "special knowledge, skill, experience, training, or education" in a particular field (Evid. Code, § 720), and they testify "in the form of an *opinion*" (*id.*, § 801, italics added). The word "opinion" implies a subjective component to expert testimony. Moreover, expert witnesses may only testify about matters that are "beyond common experience" (*id.*, § 801, subd. (a)), and such witnesses very often testify regarding matters that lie at the frontier of human knowledge about a given subject. It is not surprising that in the latter circumstance, an expert's opinion may rely to some extent on evolving theories, assumptions, or methods. Moreover, technical limitations may inhibit an expert witness's analysis of the available data. Thus, it is conceivable — even reasonable

16

— that an expert witness's opinion may change over time without that change implying any lack of integrity on the expert's part.[1]

For example, research and scientific breakthroughs may have altered the generally accepted hypotheses of the expert's field, or new technologies may have opened up more accurate methods for resolving disputed questions. In either situation, it may be that expert witness opinion testimony in a criminal trial is later proved to be objectively untrue. If, with hindsight, a critical component of the prosecution's case is objectively untrue, then the validity of any resulting guilt finding is called into question. It does not matter *why* the critical evidence was untrue; regardless of *why* it was untrue, the *fact* that it was untrue, coupled with the fact that it affected the outcome of the trial, casts a doubt over the verdict of guilt. In such circumstances, the law places the importance of integrity in criminal trials above the public's interest in the finality of the judgment. (*In re Hall*, *supra*, 30 Cal.3d at p. 424.)

Given, on the one hand, the subjective component of expert opinion testimony, and, on the other hand, the possibility that advances in science and technology might prove an earlier-held opinion to be objectively untrue, it is critical to define what precisely is meant by "false" when the false evidence standard of Penal Code section 1473 is applied to expert opinion testimony.

When an expert witness gives an opinion at trial and later simply has second thoughts about the matter, without any significant advance having occurred in the witness's field of expertise or in the available technology, it would not be accurate to say that the witness's opinion at trial was *false*. Rather, in that

---

[1]     Our discussion here presumes good faith expert opinion testimony. Perjury is always "[f]alse evidence" for purposes of Penal Code section 1473, subdivision (b).

17

situation there would be no reason to value the later opinion over the earlier. Therefore, one does not establish false evidence merely by presenting evidence that an expert witness has recanted the opinion testimony given at trial. Likewise, when new expert opinion testimony is offered that criticizes or casts doubt on opinion testimony given at trial, one has not necessarily established that the opinion at trial was *false*. Rather, in that situation one has merely demonstrated the subjective component of expert opinion testimony.

When, however, there has been a generally accepted and relevant advance in the witness's field of expertise, or when a widely accepted new technology has allowed experts to reach an objectively more accurate conclusion, a strong reason may exist for valuing a later opinion over an earlier opinion. If, and only if, a preponderance of the evidence shows that an expert opinion stated at trial was objectively untrue, the false evidence standard applies.[2] In that narrow

---

[2] The dissent asserts that a habeas corpus petitioner need not show that the expert's ultimate conclusion was untrue; rather, the petitioner need only undermine the analytical basis of that conclusion. (Dis. opn. of Liu, J., *post*, pp. 3-9.) Thus, according to the dissent, petitioner here need not show that Dr. Sperber's conclusion was wrong regarding the source of the lesion on murder victim Pamela's hand; rather, petitioner need only show that Dr. Sperber relied on a false assumption to reach that conclusion. (*Ibid.*)

The dissent's interpretation of Penal Code section 1473's subdivision (b) would permit habeas corpus relief *even when the petitioner's own experts at the habeas corpus proceeding fully agreed with the conclusion of the prosecution's trial expert*. If, for example, petitioner's experts agreed with Dr. Sperber that the lesion at issue here was a bite mark, and also that it was consistent with petitioner's unusual dentition, but those experts had a different scientific basis for reaching their conclusion, then the dissent would apparently permit habeas corpus relief on the ground that Dr. Sperber's *scientific basis* was subject to criticism, notwithstanding petitioner's experts' confirmation of Dr. Sperber's conclusion. We doubt that the Legislature had that in mind when it used the term "false evidence" in Penal Code section 1473's subdivision (b).

circumstance, if it is reasonably probable that the invalid opinion given at trial affected the verdict, then habeas corpus relief is appropriate.

With these principles in mind, we turn to the facts surrounding the issue here.

### 3. Dr. Sperber's opinion at trial

In regard to his false evidence claim, petitioner focuses on Dr. Sperber's expert opinion given at trial that the arrangement of petitioner's lower teeth occurs in only 1 or 2 percent of the general population, and that his lower teeth may have been the source of the lesion on Pamela's hand.[3] At the evidentiary hearing in the superior court, petitioner presented the testimony of Dr. Sperber himself and three other experts in forensic dentistry. Discussing his trial testimony that "it might be one or two or less" out of a hundred people who would have petitioner's specific dental irregularity, Dr. Sperber said that he had not based his testimony on any scientific studies, and that without such studies, he should not have testified to statistical percentages. With regard to the lesion on Pamela's hand, Dr. Sperber and three other experts cast doubt on Dr. Sperber's trial testimony. These experts were uncertain that the lesion was a human bite mark; if it was, they all — including Dr. Sperber — agreed that petitioner's teeth did not definitively match the lesion.

Three of these experts — Drs. Golden, Bowers, and Johansen — relied on the availability of new technology in reaching their opinions. Using a computer program, these experts were able to remove angular distortion from the

---

[3]     Petitioner also asserts that the blue fibers that prosecution criminalist Gregonis found jammed into a crack in murder victim Pamela's fingernail constituted false evidence, insinuating that they were planted there by Gregonis. The superior court, however, made a specific factual finding — at the close of the evidentiary hearing on petitioner's habeas corpus claims — rejecting this false evidence claim, and that finding has ample support in the record before us.

photograph of the lesion on murder victim Pamela's hand, thus artificially generating an accurately sized front-facing image of the lesion. The experts then laid an image of petitioner's lower teeth over the corrected image of the lesion, and they found no match, although they could not definitively rule out petitioner's teeth as a *possible* source of the lesion.

As explained earlier (pp. 17-18, *ante*), Dr. Sperber's posttrial change of view regarding the statistical prevalence of petitioner's abnormal dentition and regarding the cause of the lesion on murder victim Pamela's hand does not by itself establish that his opinion offered at trial was "false evidence" under Penal Code section 1473, subdivision (b). In the habeas corpus proceedings, Dr. Sperber did not testify that he relied on new technology in revising his views about the lesion. When an expert witness merely changes an earlier-given opinion, without relying on any significant advance in the witness's field of expertise or in the available technology, no reason exists to value the later opinion over the earlier. Likewise, the fact here that *other* dental experts disagree with or are critical of the opinion Dr. Sperber gave at trial does not by itself establish that his trial opinion was false. As noted (p. 18, *ante*), opinion testimony often includes a subjective component, and good faith disagreements among credible experts are commonplace. That point is particularly relevant here, where the question at issue was an attempt to surmise the cause of an indistinct reddening and bruising of the murder victim's skin.

But the opinion Dr. Sperber offered at trial could qualify as "false evidence" for purposes of Penal Code section 1473's subdivision (b) if, for example, a generally recognized and relevant advance in science or technology proved under the preponderance of the evidence standard that the trial opinion was objectively untrue. (See p. 18, *ante*.)

The district attorney does not contend that the technology to remove angular distortion from photographs existed at petitioner's 1997 murder trial, and that the defense therefore should have used such technology at trial to impeach Dr. Sperber. (See *People v. Marshall* (1996) 13 Cal.4th 799, 830-831 ["We conclude defendant waived his claim that his conviction was based on false testimony by failing to raise it at trial when the falseness of [the] testimony was well known to him . . . ."].)  In addition, testimony at the 2007 habeas corpus evidentiary hearing established that the technology to remove such distortion did not exist.[4]  In light of that testimony, we conclude that this case involves a generally recognized and relevant advance in technology.  Here, however, the new technology has not proved that any portion of Dr. Sperber's trial testimony was objectively untrue.

Dr. Sperber testified at the 1997 trial that petitioner's dental irregularity "might" occur in 2 percent or less of the general population, but he added that this estimate was not based on any scientific studies.  The availability of new technology to remove angular distortion from photographs has not proved that Dr. Sperber's estimate regarding the prevalence of petitioner's abnormal dentition was objectively untrue.  Moreover, Dr. Sperber's testimony at the habeas corpus proceeding merely reiterated what he had said at trial, that the percentage was an estimate that was not based on any scientific studies.

_____

[4]     Dr. Sperber testified at the hearing that the technology in question was not, to his knowledge, available in 1997.  He acknowledged that there may have been some initial studies, but he said that forensic dentists were not using the technology.  Dr. Golden agreed with Dr. Sperber on this point.  Drs. Bowers and Johansen testified that there were a few articles in the late 1990's that led to their use of the technique starting in 2000.  In addition, Dr. Bowers's declaration in support of the habeas corpus petition stated that the computerized technology "did not exist either in the forensic literature [or] forensic casework at the time of the 1997 trial of Mr. Richards," and that "the methods [he and Dr. Johansen used] were peer reviewed and published after [petitioner's] conviction."

21

Dr. Sperber further testified at trial that the lesion on murder victim Pamela's hand was a human bite mark, and that he could not rule out petitioner's teeth as a possible source of the mark. With the benefit of new technology, petitioner's experts at the habeas corpus evidentiary hearing shed doubt on those conclusions, but even with the new technology, these experts still could not definitively rule out petitioner's teeth as a *possible* source of the mark.[5]

---

[5] The dissent argues that by using the word "definitively" in this context, we are imposing too high a burden of proof on petitioner, and that petitioner need only prove the falsity of Dr. Sperber's trial testimony by a preponderance of the evidence. (Dis. opn. of Liu, J., *post*, pp. 9-13.) The dissent discusses by way of comparison this court's decision in *In re Malone* (1996) 12 Cal.4th 935, in which a prosecution informant made conflicting statements regarding whether he had fabricated his trial testimony. Noting that the informant had "a practice of fabricating information on pending criminal matters" (*id*. at p. 963), *Malone* accepted the referee's finding that the petitioner had proved the falsity of the informant's trial testimony by a preponderance of the evidence (*id*. at pp. 962-963).

We agree with the dissent that the preponderance-of-the-evidence standard applies. But the dissent fails to appreciate the difference between eyewitness testimony from a witness who had a practice of fabrication and good faith expert opinion about a question as elusive as what may have caused an indistinct bruise, which is the matter at issue here. One does not prove a subjective opinion false by presenting testimony conceding its possible truth. That is particularly so when, as here, the opinion being proved false was highly tentative at the outset (asserting that petitioner's dentition is "consistent with" the bite mark) and the opinions being used to prove its falsity are equally tentative (asserting, for example, that the expert "would tend to rule out [petitioner]"). It is as if a meteorologist's forecast that "there could be some rain today" were being disproved by another meteorologist's forecast that despite the heavy clouds, "I tend to think it won't rain." Whatever one might think of the second meteorologist's forecast, it does not prove the first forecast false.

Thus, the dissent confuses the standard of proof with the question of what must be proved. The falsity of the trial evidence must be proved, and in the case of a tentative opinion regarding a subjective question, the opinion is not proved false if, as here, the petitioner's experts concede it might be true. Otherwise, every criminal case becomes a never-ending battle of experts over subjective assertions that can never be conclusively determined one way or the other.

Dr. Johansen, for example, could not exclude petitioner's teeth as a *possible* source of the mark, but in his opinion it was just as likely that the indistinct lesion was caused by the fencing material as it was by petitioner's teeth. The other doctors found no match to petitioner's teeth, but they also did not absolutely rule out petitioner's teeth as a *possible* source of the mark. Petitioner's habeas corpus evidence at most calls into question Dr. Sperber's opinion at trial that petitioner's teeth could have been the source of the mark, but it has not proved that opinion to be objectively untrue. Hence, Dr. Sperber's trial opinion is not "false evidence" for purposes of section 1473, subdivision (b).

Because petitioner failed to establish that any of the evidence offered at his 1997 trial was objectively false, the false evidence provision of Penal Code section 1473's subdivision (b) does not apply here, and petitioner is not entitled to habeas corpus relief on that ground. Nevertheless, the question remains whether he is entitled to habeas corpus relief on the basis of newly discovered evidence.

**B. New Evidence**

As noted, habeas corpus relief is appropriate if the petitioner presents *new evidence* that " 'point[s] unerringly to innocence or reduced culpability.' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766.) Petitioner argues that the evidence he presented at the evidentiary hearing meets this standard. We disagree, as discussed below.

*1. Lesion on Pamela's hand*

As discussed in regard to petitioner's false evidence claim (pp. 19-20, *ante*), Drs. Golden, Bowers, and Johansen testified at the evidentiary hearing that by removing the angular distortion from the photograph of the lesion on murder victim Pamela's hand, they concluded that petitioner's teeth did *not* match the lesion, and that the lesion might not even be a bite mark. This evidence tended to undermine Dr. Sperber's opinion at the 1997 trial that the lesion was a bite mark,

23

and that petitioner's teeth could not be ruled out as a possible source of the mark. This new evidence, however, does not " 'point unerringly to innocence or reduced culpability' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766), as we explain below.

The case against petitioner was strong. When Pamela's murder took place, petitioner and Pamela were in the process of ending their marriage, and Pamela planned on leaving petitioner. No other motive (such as robbery or rape) appears for Pamela's murder. The remote property where the couple lived was guarded by several dogs that were hostile to strangers, so it is unlikely that a person other than petitioner (who was familiar to the dogs) would have had access to the property. Footprints and tire tracks in the soft ground at the couple's property indicated that no one other than petitioner, Pamela, and the sheriff's investigators had been present on the night of the murder. When the deputy sheriff responding to petitioner's 911 telephone call arrived at the murder scene at 12:30 a.m., petitioner's demeanor seemed "rehearsed," and petitioner knew an unusual amount of detail about the crime scene, despite the darkness. (See pp. 3-4, *ante*.)

At that time, petitioner told the deputy that the battery in the camper had lost its charge, that he did not turn on the generator, and that he had no light. Yet petitioner was able to take the deputy on a detailed tour of the crime scene. He knew that Pamela's pants were lying next to the generator. He knew that her underwear was inside the camper. He knew that her blood was inside the camper on the pillow. He knew that there was "blood on rocks up against the hill." He knew that there was a bloodstained paving stone that had been thrown "over the side of the hill." He also theorized about what Pamela was doing when her murderer arrived, where the murderer confronted Pamela, and what she did in her defense. And he surmised that the murderer had used a cinderblock to kill Pamela. (See pp. 3-4, *ante*.)

24

Furthermore, Pamela's artificial fingernail was broken (apparently in her struggle with her assailant), and fibers matching petitioner's blue cotton shirt were found wedged in the crack of the broken fingernail. Also, petitioner had Pamela's bloodstains on his pants and shoes — stains that in the opinion of the prosecution's expert witness were from blood spatter, not from drips or contact (indicating that petitioner was present when Pamela's skull was smashed). (See pp. 4-5, *ante*.)

All of that evidence pointed persuasively to petitioner's guilt. Dr. Sperber's trial testimony was also evidence pointing to petitioner's guilt, although it was hardly conclusive. We cannot say that petitioner has "unerringly" established his innocence (*In re Clark*, *supra*, 5 Cal.4th at p. 766) merely by casting doubt on Dr. Sperber's conclusions, when he has not undermined the other evidence establishing his guilt.

### 2. *Blue fibers*

At the 1997 trial, the prosecution's evidence showed that murder victim Pamela's artificial fingernail was broken (apparently in her struggle with her assailant), and that wedged in the crack of the broken fingernail were blue fibers indistinguishable from those in the blue cotton shirt that petitioner was wearing on the night of the murder. Petitioner's evidence presented at the 2007 habeas corpus evidentiary hearing indicates that the blue fibers embedded in the crack in Pamela's fingernail may have found their way into that crack *after* the crime, not before. This is not new evidence, however. (See *In re Hall*, *supra*, 30 Cal.3d at p. 420 [a habeas corpus petitioner must present evidence that was unavailable at trial].) It is based on an autopsy photograph that existed at the time of petitioner's trial. In seeking habeas corpus relief, petitioner has merely made a high resolution scan of that photograph and increased the color saturation. Moreover, the evidence is far from conclusive. Petitioner's evidence shows that the fibers, which

were visible in a video made *after* the autopsy, were not visible in the still photograph taken *during* the autopsy. That fact, however, does not mean that the fibers were not present. Petitioner offered no evidence regarding the technology used to make the original autopsy photograph (in which the fibers were not visible). By contrast, the video (in which the fibers were visible) was made by attaching a video recorder to a microscope that magnified Pamela's fingers between 10 and 100 times. The technology by which the earlier photograph was made may not have resulted in a photograph with sufficient detail to record the presence of the microscopic blue fibers, and a high resolution scan of a photograph cannot improve the limitations of the original. Thus, the nonappearance of the blue fibers in the earlier photograph does not conclusively establish their absence from Pamela's fingernail.

Moreover, prosecution criminalist Daniel Gregonis, who detected the blue fibers, testified at trial that they were embedded deep in the crack of Pamela's broken fingernail. Therefore, it may be that the blue fibers became visible only after Gregonis opened the crack in the fingernail and removed some of the fibers for closer inspection.

Petitioner also presented evidence that prosecution trial witness Craig Ogino, who examined scrapings from Pamela's fingertips, and who may also have examined Pamela's fingers, did not mention the blue fibers in his report. But this evidence is inconclusive. The blue fibers were first discovered by criminalist Gregonis when he used a microscope to examine Pamela's fingertips. Ogino may not have examined the fingertips, and if he did, he may have done so without the aid of a microscope, and therefore he may have overlooked the fibers.

As noted (pp. 24-25, *ante*), the trial record includes significant evidence pointing persuasively to petitioner's guilt, including evidence of motive and opportunity, evidence that petitioner knew details of the crime scene that only the

26

murderer could know, and evidence of blood spatter on petitioner's clothes and shoes, indicating that he was present when Pamela's head was smashed. Given all that evidence, we cannot say that petitioner has "unerringly" established his innocence (*In re Clark*, *supra*, 5 Cal.4th at p. 766) simply by presenting evidence that the blue fibers caught in a crack in Pamela's broken fingernail *may* have come from a source other than petitioner.

### 3. *Two-centimeter hair*

A similar analysis applies to the two-centimeter human hair that investigators found under Pamela's long artificial fingernail. Petitioner's evidence at the habeas corpus evidentiary hearing indicates that this hair belonged to some third person, not to Pamela or to petitioner. That fact, however, does not point unerringly to petitioner's innocence. The hair might have been from someone Pamela encountered at the restaurant where she worked or elsewhere. Because Pamela had "extended" artificial fingernails, the hair might have been lodged under the fingernail for a day or more without being noticed. In light of the significant evidence pointing to petitioner's guilt (pp. 24-25, *ante*), petitioner has not established " 'unerring[] . . . innocence' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766) simply by showing that the piece of hair under Pamela's fingernail was neither hers nor petitioner's.

### 4. *Male DNA on paving stone*

Petitioner has not proved unerring innocence by presenting evidence at the 2007 habeas corpus proceeding that some of the DNA on the paving stone that might have been used to kill Pamela came from one or more men other than petitioner.

At the 1997 trial, prosecution criminalist Gregonis testified that the cinderblock was one of the murder weapons, but that the paving stone might also

27

have been used as a weapon. His laboratory notes indicated a specific location on the paving stone where he expected to find the murderer's DNA. After the trial, petitioner's expert found traces of male DNA not belonging to petitioner in the approximate location on the paving stone that Gregonis had indicated in his notes. But Gregonis testified at the habeas corpus evidentiary hearing that the DNA in question was a small amount that could have come from contamination of the evidence during courtroom handling. We conclude the presence on the bloodstained paving stone of trace DNA that was not from murder victim Pamela or from petitioner does not " 'point unerringly to [petitioner's] innocence' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766), in light of all the evidence supporting petitioner's conviction of his wife's murder. (Pp. 24-25, *ante*.)

### 5. *Cumulative effect of new evidence*

Finally, even when all the new evidence is considered together, we conclude that it does not " 'point unerringly to [petitioner's] innocence.' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766.) The evidence that petitioner was the actual murderer remains strong.

Because petitioner has failed to establish that any of the evidence offered at his 1997 trial was false (Pen. Code, § 1473, subd. (b)), and because his newly discovered evidence does not " 'point unerringly to innocence or reduced culpability' " (*In re Clark*, *supra*, 5 Cal.4th at p. 766), the superior court erred in granting habeas corpus relief, and the Court of Appeal was correct to vacate the superior court's order, and to direct that court to deny the petition for a writ of habeas corpus.

**DISPOSITION**

The judgment of the Court of Appeal is affirmed.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
CORRIGAN, J.

**DISSENTING OPINION BY LIU, J.**

Before 1975, a petitioner seeking habeas corpus relief could generally prevail only where the prosecution knowingly offered perjured testimony or the petitioner was able to produce new evidence pointing unerringly toward innocence. (See maj. opn., *ante*, at p. 14.) In 1975, the Legislature amended the Penal Code to provide new grounds for relief when a conviction or guilty plea rested on false evidence. (See Stats. 1975, ch. 1047.) The statute now in effect makes no distinction with respect to how false evidence was introduced, nor does it condition relief upon the petitioner's ability to produce new evidence that was not available at trial. Instead, the petitioner is entitled to relief whenever "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced." (Pen. Code, § 1473, subd. (b), hereafter section 1473(b); all further statutory references are to the Penal Code.) As the court observes, "under the present version of section 1473 it does not matter *why* evidence is false or *whether any party to the proceeding knew* it was false. So long as some piece of evidence at trial was actually false, and so long as it is reasonably probable that without that evidence the verdict would have been different, habeas corpus relief is appropriate." (Maj. opn., *ante*, at p. 15.)

Although the false evidence statute makes no distinction between lay and expert testimony, today's decision imposes novel burdens on a petitioner who seeks relief under section 1473(b) where false evidence was introduced through

1

expert testimony.  But as explained below, there is no reason to treat expert testimony differently from lay testimony under section 1473(b).  I would hold, consistent with our precedents, that "false evidence" within the meaning of section 1473(b) is established when a petitioner shows by a preponderance of the evidence either the falsity of an expert's testimony or the falsity of an underlying fact essential to an expert's testimony.  Because petitioner has met that burden here, and because the false evidence was sufficiently prejudicial to cast doubt on the verdict of guilt, I respectfully dissent.

## I.

Section 1473(b) provides in relevant part:  "A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons:  (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration . . . ."  This court has repeatedly considered the applicability of section 1473(b) to cases of lay testimony, particularly eyewitness identification.  (See, e.g., *In re Bell* (2007) 42 Cal.4th 630 [eyewitness identification]; *In re Roberts* (2003) 29 Cal.4th 726 (*Roberts*) [eyewitness identification]; *In re Malone* (1996) 12 Cal.4th 935 (*Malone*) [prison informant]; *In re Sassounian* (1995) 9 Cal.4th 535 (*Sassounian*) [prison informant]; *In re Hall* (1981) 30 Cal.3d 408 (*Hall*) [eyewitness identification].)  The question now before us is how to apply the same statutory provision to expert testimony that is alleged to be false.

Section 1473(b) makes no distinction between lay and expert testimony.  Yet today's opinion effectively narrows the availability of habeas corpus relief when the allegedly false testimony was offered by an expert rather than a lay witness.  The court does so by announcing the following rule:  "When . . . there has been a generally accepted and relevant advance in the witness's field of expertise, or when a widely accepted new technology has allowed experts to reach

2

an objectively more accurate conclusion, a strong reason may exist for valuing a later opinion over an earlier opinion. If, and only if, a preponderance of the evidence shows that an expert opinion stated at trial was objectively untrue, the false evidence standard applies. In that narrow circumstance, if it is reasonably probable that the invalid opinion given at trial affected the verdict, then habeas corpus relief is appropriate." (Maj. opn., *ante*, at pp. 18–19, fn. omitted.) I see two problems with this approach.

**A.**

The court says that a petitioner must "show[] that an expert opinion stated at trial was objectively untrue" in order to meet the false evidence standard. (Maj. opn., *ante*, at p. 18.) By this, the court means that the ultimate opinion rendered by the expert — here, Dr. Sperber's trial testimony that the lesion on the victim's hand was "consistent with" petitioner's teeth — must be proven objectively untrue. Petitioner fell short of this proof, the court says, because his experts in the habeas corpus proceeding "could not definitively rule out petitioner's teeth as a *possible* source of the lesion." (Maj. opn., *ante*, at p. 20, italics in original.)

By focusing exclusively on whether the expert's ultimate opinion has been proven untrue, the court overlooks an important and conventional manner in which trial testimony may later be proven false. Consider the facts of *Hall*, *supra*, 30 Cal.3d 408. Three brothers — Victor Lara, Daniel Lara, and Jesse Ortiz — were assaulted by several youths. One of the youths had a gun and fired several shots, "slightly wounding Victor and Daniel, and killing Jesse with a single bullet in the head." (*Id.* at p. 414.) As eyewitnesses to the crime, Victor and Daniel testified at trial that the petitioner was the gunman. (*Ibid.*) After trial, however, the Lara brothers recanted their testimony, believing that someone else was the gunman. Victor signed "a declaration stating in part, 'I never got a good look at the person who shot my brother. I was mistaken when I later identified [petitioner] Hall as

3

the killer . . . .' Daniel Lara testified in the same fashion, explaining his erroneous identification by the fact that he was distraught about his brother's death and careless in deciding which of the . . . youths were responsible." (*Id.* at p. 417.) While acknowledging that "we routinely view recantations with suspicion," the court found the recantations credible and sustained the habeas corpus referee's finding to that effect. (*Id.* at p. 418.) The court noted that this was not a case of perjured trial testimony: "there is no evidence whatever of ulterior motive or dishonesty on the part of either brother." (*Id.* at pp. 417–418.) On these facts, the court held under section 1473(b) that "the trial testimony of the Laras identifying petitioner as the killer apparently was false, albeit unintentionally so." (*Id.* at p. 424.)

The Lara brothers' trial testimony was false evidence because the perceptual basis for their eyewitness testimony turned out to be false. Victor said " 'I never got a good look at the person who shot my brother,' " and Daniel said he had been "distraught" and "careless" in identifying the gunman. (*Hall*, *supra*, 30 Cal.3d at p. 417.) In prevailing on his false evidence claim, the petitioner in *Hall* did not need to show that the ultimate fact to which the Lara brothers testified at trial — that the petitioner was the gunman — was untrue. It was enough to show that the perceptual basis of the trial testimony — that the Lara brothers, as eyewitnesses to the crime, were well-situated to identify the gunman — was untrue. When a lay witness in good faith gives testimony that the witness later concedes he or she had no perceptual basis to give, that witness has given false evidence within the meaning of section 1473(b). And that is so regardless of whether other evidence demonstrates the truth or falsity of the ultimate fact to which the witness testified.

There is no reason to treat expert testimony differently. Just as the truth or falsity of eyewitness testimony under section 1473(b) depends on the truth or

4

falsity of underlying facts concerning the witness's perceptual abilities, the truth or falsity of expert testimony depends on the truth or falsity of underlying facts essential to the expert's inferential method and ultimate opinion.

The present case illustrates the point. Dr. Sperber's trial testimony culminated in his opinion that the lesion on the victim's hand was consistent with petitioner's abnormal dentition. To reach that conclusion, Dr. Sperber relied on a series of intermediate steps. He explained how forensic odontologists use crime scene or autopsy photographs to make a dental comparison. He explained how he determines whether an injury is in fact a bite mark, and he concluded from a single photograph of the victim's hand that the lesion was a human bite mark. He explained why he believed the mark came from a lower not upper jaw. He noted a gap in the lesion where it appears an incisor tooth failed to leave a mark. He then showed the jurors a mold of petitioner's teeth, explaining that petitioner's right incisor was abnormal and would not have left a mark. He further explained how he compared the mold from petitioner's mouth with the photograph of the lesion. Based on these steps, Dr. Sperber concluded that the mark was consistent with petitioner's teeth.

A crucial fact underlying all of Dr. Sperber's testimony was that the single photograph of the victim's hand was alone a sufficient basis for reaching his ultimate conclusion. He acknowledged problems with the photograph, including distortion, and he said additional photographs would have helped him render a more definite conclusion. But he never wavered from the essential premise that the single photograph was itself a sufficient basis to render an opinion. Based on that premise, Dr. Sperber offered his expert opinion that the lesion was a bite mark consistent with petitioner's teeth. That underlying premise — akin to the perceptual premise of the eyewitness testimony shown to be false in *Hall* — has now been shown to be false by petitioner's habeas corpus evidence.

5

The testimony at the habeas corpus proceeding shows by a preponderance of the evidence that the photograph alone did not provide a sufficient basis for comparison with petitioner's teeth. Petitioner first presented testimony by Dr. Sperber himself. After reviewing additional autopsy photographs not provided to him by the prosecution at the time of trial, Dr. Sperber was asked, "Doctor, had you had those photographs prior to your testimony in 1997 at the trial of Mr. Richards, would they have affected your opinion?" He answered, "Very definitely." In light of those additional photographs and after considering other problems with his analysis, Dr. Sperber testified, "I don't know for sure that that lesion or that photograph [presented to the jury] depicts a bite mark." And based on those same factors, Dr. Sperber concluded that "[m]y opinion today is that [petitioner's] teeth, as we have seen, are not consistent with the lesion on the hand" and that "I would rule him out basically on the evidence as I've seen now in hindsight."

Petitioner also called Dr. Golden, who had testified at trial that petitioner's teeth were consistent with the lesion, but that the quality of the photograph was too poor to make a definitive determination as to whether it was or was not consistent with petitioner. At the habeas corpus hearing, Dr. Golden testified about advances in technology that allowed experts to correct distortion in photographs like the one relied on by both him and Dr. Sperber at trial. He further testified that since that technology came into use, he has personally used that technology to correct photo distortion in cases in which he testified for the county. Based on this technology, Dr. Golden testified that he would still view the lesion as consistent with a human bite mark, though it could also have come from a variety of sources. In addition, Dr. Golden said he "would tend to rule out Mr. Richards . . . as the suspected biter" and that "[a]fter all the subsequent analyses

6

with the photographic correction and the digital analysis, my opinion is that I would exclude him."

Petitioner called two additional dental experts: Dr. Johansen and Dr. Bowers. Dr. Johansen testified at length about the procedure he followed to correct the distortion in the photograph of the victim's hand using Adobe Photoshop. He also looked at other crime scene photographs not made available to Dr. Sperber at the time of trial. Even after correcting the photo distortion, Dr. Johansen concluded that "the very, very poor quality of the bite mark" precluded him from either including or excluding petitioner as the source of the mark. In his opinion, it was just as likely that the lesion was caused by fencing material located under the victim's body as by petitioner's teeth.

Petitioner also called Dr. Bowers to testify about the process of correcting photo distortion. After correcting the photograph, Dr. Bowers compared the size of the lesion to the span of petitioner's lower teeth from one side to the other, and he concluded that the lesion was too small to have been made by petitioner's teeth. Comparing petitioner's individual teeth to the lesion, Dr. Bowers found three teeth that matched the lesion and three that did not. Dr. Bowers testified that such a match "doesn't have any forensic significance in identifying [the] biter." Finally, Dr. Bowers testified that the other crime scene and autopsy photographs of the victim "raised significant doubt . . . that the hand injury in this original Richards case was caused by teeth."

Significantly, the Attorney General offered no competing evidence. This is not a case in which a habeas corpus evidentiary hearing has devolved into a fresh battle of the experts. (Cf. maj. opn., *ante*, at p. 22, fn. 5.) Instead, all of the experts provided testimony refuting critical facts underlying Dr. Sperber's trial testimony. In essence, all four experts testified that the photograph did not

7

provide a sufficient basis for Dr. Sperber to conclude at trial that the lesion was a bite mark consistent with petitioner's teeth.

There will no doubt be cases where it is more difficult to determine whether the falsity of one or more facts underlying an expert's trial testimony renders the entire opinion false. In many cases, an expert opinion may be based on a variety of facts, and the falsity of one fact might not undermine the expert's ultimate conclusion. But this is not such a case. Here, the critical underlying fact — that the single uncorrected photograph provided Dr. Sperber with a sufficient basis for matching petitioner's teeth to a lesion on the victim's hand — was proven false. Without that premise, Dr. Sperber's trial testimony that the lesion was consistent with petitioner's teeth was false evidence. Just as the eyewitness testimony in *Hall* was false because it depended crucially on the witnesses having seen something that it turns out they did not actually see, the expert testimony here was false because it depended crucially on Dr. Sperber having seen something — a true photographic representation of the lesion on the victim's hand — that it turns out he did not actually see. In sum, because petitioner has shown by a preponderance of the evidence that the essential premise of Dr. Sperber's trial testimony was false, it follows that the testimony was false evidence under section 1473(b).

The court suggests that this approach might warrant habeas corpus relief even if the petitioner's experts at the habeas corpus proceeding fully agreed with the trial expert's conclusion but showed that the expert "relied on a false assumption to reach that conclusion." (Maj. opn., *ante*, at p. 18, fn. 2.) This concern is unwarranted. First, the petitioner would have to show not only that the trial expert relied on an underlying fact or methodology that turned out to be false, but also that the falsity was sufficient to undermine the trial expert's conclusion. Second, the petitioner must show prejudice to obtain relief, and it is difficult to see

8

how the petitioner could make this showing if the petitioner's habeas experts agree with the trial expert's conclusion.

**B.**

Instead of focusing on the factual underpinnings of the expert's trial testimony, the court looks only at the expert's ultimate conclusion. As explained above, section 1473(b) does not require petitioner to show that Dr. Sperber's ultimate conclusion that the bite mark was consistent with petitioner's teeth was objectively untrue; it is enough that petitioner has shown the falsity of an underlying premise essential to Dr. Sperber's conclusion. Nevertheless, showing Dr. Sperber's ultimate conclusion to be objectively untrue is an alternative means of establishing false evidence. On the facts here, I believe petitioner has met that burden as well. The court reaches a contrary conclusion by unjustifiably heightening the standard of proof required to show the falsity of expert testimony.

Under settled law, a petitioner seeking habeas corpus relief "bears the 'burden . . . of alleging . . . the facts on which he relies in support of his claim [or claims] for relief . . . .' [Citation.] He also 'bears the burden of proving [those] facts . . . by a preponderance of the evidence.' [Citation.]" (*Sassounian*, *supra*, 9 Cal.4th at pp. 546–547.) Thus a petitioner seeking relief based on false evidence must prove — not "definitively" or "absolutely," but by a preponderance of the evidence — that false evidence was offered against him at trial.

We made clear the proper application of this standard to a false evidence claim in *Malone*, *supra*, 12 Cal.4th 935. There, a prison informant testified at the petitioner's trial that the petitioner had confessed to him several crimes. The petitioner sought relief after the informant recanted his original trial testimony, then recanted his recantation. We said: "From this record, it is impossible to know with certainty whether [the informant] lied or told the truth at petitioner's trial. Petitioner's burden, however, is only to prove his claims by a preponderance

9

of the evidence.  [Citation.]  On the basis of all the evidence, we agree with the referee [that the informant] probably lied when he testified petitioner confessed to him . . . ."  (*Id.* at p. 962.)  We did not require the petitioner in *Malone* to definitively show that he never confessed to the informant.  It was enough that the informant "probably lied" when he testified to the contrary.

In the present case, Dr. Sperber testified at trial that the lesion on the victim's hand was "consistent with" petitioner's teeth.  This testimony is false if the lesion was in fact inconsistent with petitioner's teeth.  Under *Malone*, it is enough for petitioner to show the inconsistency by a preponderance of the evidence.  Petitioner's habeas corpus evidence meets this standard.  As previously noted, Dr. Sperber examined additional evidence at the habeas proceeding and disavowed his trial testimony, saying:  "I would rule [petitioner] out basically on the evidence as I've seen now."  A second expert, Dr. Golden, used new technology to remove angular distortion from the photo of the lesion and said, "After all the subsequent analyses with the photographic correction and the digital analysis, my opinion is that I would exclude him."  A third expert, Dr. Bowers, observed three areas of inconsistency between petitioner's teeth and the lesion, and he also testified that the lesion "was too small . . . to have been created by Mr. Richards' lower teeth in terms of dimension of that area."  Dr. Bowers also said he had "significant doubt . . . that the hand injury in this original Richards case was caused by teeth."  A fourth expert, Dr. Johansen, said that "due to the very, very poor quality of the bite mark and the very little information contained within the bite mark, . . . I cannot exclude [petitioner] or disexclude him from the population of possible individuals that could have made that mark."  He also said it was just as likely the lesion was caused by nearby fencing material as by petitioner's teeth.

Thus, two experts expressly said they would "rule out" or "exclude" petitioner.  A third expert likewise "found no match" (maj. opn., *ante*, at p. 10)

10

between the lesion and petitioner's teeth based on size and other physical features, and "doubted whether the hand lesion was a human bite mark" (*ibid.*). A fourth expert found the quality of the photograph too poor to rule in or rule out petitioner's teeth as a possible source of the lesion. Based on the totality of the experts' testimony, petitioner has shown by a preponderance of the evidence that the lesion was inconsistent with his teeth.

Though purporting to apply the preponderance of the evidence standard, the court concludes that petitioner did not meet his burden because the habeas experts failed to conclude definitively that he was not the source of the bite. The court says the experts at the habeas corpus hearing "could not definitively rule out petitioner's teeth as a *possible* source of the lesion" (maj. opn., *ante*, at p. 20), "still could not definitively rule out petitioner's teeth as a *possible* source of the mark" after enhancing the photograph (*id.* at p. 22), and in the end "did not absolutely rule out petitioner's teeth as a *possible* source of the mark" (*id.* at p. 23). The assertion that the experts could not "definitively" or "absolutely" rule out petitioner's teeth is what leads the court to conclude that petitioner has not proven Dr. Sperber's trial testimony to be objectively untrue. (*Ibid.*)

As noted, three of the four habeas experts *did* rule out petitioner's teeth, and the fourth expert declined to draw any conclusion from the photo of the lesion. In concluding this is not enough, the court effectively requires petitioner to show that *all* of the habeas evidence, without exception, would "definitively" or "absolutely" rule out his teeth. But if that is petitioner's burden, then the court has "confuse[d] the standard of proof with the question of what must be proved" (maj. opn., *ante*, at p. 22, fn. 5) by requiring petitioner to prove the inconsistency *to a virtual certainty* rather than by a preponderance of the evidence. In *Malone*, we held that proof of falsity by a preponderance of the evidence was satisfied by the referee's finding that the informant "probably lied," even as we acknowledged that

11

"it is impossible to know with certainty whether [the informant] lied or told the truth at petitioner's trial." (*Malone*, *supra*, 12 Cal.4th at p. 962.) Because proof of falsity by a mere preponderance of the evidence *always* admits the possibility that the contested trial evidence "might be true" (maj. opn., *ante*, at p. 22, fn. 5), the court's objection to the straightforward application of the preponderance of the evidence standard to this case suggests, in essence, the court's disagreement with the standard itself.

At the core of the court's reasoning that petitioner's evidence must "definitively" or "absolutely" rule out his teeth is the premise that experts "testify 'in the form of an *opinion*' ([Evid. Code], § 801, italics added)" and that "[t]he word 'opinion' implies a subjective component to expert testimony." (Maj. opn., *ante*, at p. 16.) But the court's reading of the word "opinion" is a miscue. The opinions typically given by experts are not subjective in the "chocolate tastes better than vanilla" sense. Instead, opinion testimony may include a subjective component in the sense that experts use professional judgment in the course of applying a methodology or drawing inferences to reach an ultimate conclusion. But the ultimate conclusion itself — the evidence that is either true or false within the meaning of section 1473(b) — is often, as here, a representation of objective fact.

In the present case, Dr. Sperber gave an expert opinion at trial, but he was opining on *a question of fact*. We call his testimony an "opinion" because of the inferences and judgments he used to derive an ultimate conclusion. But the ultimate conclusion itself — the lesion on the victim's hand was "consistent with" petitioner's teeth — is a claim of objective fact. Either the lesion was consistent with petitioner's teeth, or it wasn't. Either way, this is a matter of objective fact that is subject to falsification like other matters of objective fact. *Malone* holds that the standard for showing false evidence is proof of falsity by a preponderance

of the evidence. The petitioner in *Malone* did not definitively prove the informant lied about the confession; the petitioner only showed it was more likely than not. Similarly here, petitioner need not definitively prove the lesion was inconsistent with his teeth; to prove the expert's conclusion false, he only needs to show that the lesion was inconsistent with his teeth by a preponderance of the evidence. Petitioner has met that burden.

## II.

I now consider whether the false evidence was substantially material and probative on the issue of guilt. " 'False evidence is "substantially material or probative" if it is "of such significance that it may have affected the outcome," in the sense that "*with reasonable probability* it *could have* affected the outcome . . . ." [Citation.] In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that, had it not been introduced, the result would have been different. [Citation.] The requisite "reasonable probability," we believe, is such as undermines the reviewing court's confidence in the outcome.' " (*Malone*, *supra*, 12 Cal.4th at p. 965, italics added by *Malone*; see *Roberts*, *supra*, 29 Cal.4th at pp. 741–742.) We make such a determination based on the totality of the relevant circumstances. (*Malone*, at p. 965.)

One notable aspect of this case is the history of two hung juries before the third was able to reach a verdict. The importance of a trial history that includes hung juries is underscored by this court's discussion in *People v. Gonzalez* (2006) 38 Cal.4th 983 (*Gonzalez*). In *Gonzalez*, we upheld the judgment of guilt and the special circumstance finding of multiple murder and personal use of a firearm. But the court found error in the penalty phase where the judge denied reciprocal discovery of the prosecution's evidence in rebuttal after the defendant disclosed his evidence in mitigation. In light of that erroneous ruling, the defendant opted

13

not to present mitigating evidence as he did in the first penalty phase. The first penalty phase trial had resulted in a hung jury.

Because the state law error in *Gonzalez* occurred at the penalty phase of a capital trial, the question was whether there was a reasonable possibility (not probability) that the error affected the verdict. (See *People v. Brown* (1988) 46 Cal.3d 432, 446–448.) The court found that there was "a strong suggestion that the defense *would* have been different" in the absence of the trial court's erroneous ruling. (*Gonzalez*, *supra*, 38 Cal.4th at p. 962.) We then said: "We also find a reasonable possibility the verdict would have been different had defendant presented the proffered mitigating evidence. Although the crime here was egregious, a death verdict was not a foregone conclusion. Indeed, the first penalty trial ended with a hung jury. The aggravating evidence of defendant's other crimes (possession of an assault weapon, two assaults on inmates, and possession of a shank in jail), although serious, was not overwhelming. Father Horan's proffered evidence regarding the ability of persons to change was not very compelling, but defendant presented similar evidence in mitigation at the first penalty trial and obtained a hung jury. The main difference between the two trials was that defendant presented mitigating evidence at the first trial that he did not present at the second trial. Under the circumstances, we find it reasonably possible the verdict at the second trial would have been different had defendant presented similar mitigating evidence at the second trial." (*Ibid.*)

Unlike *Gonzalez*, which considered an evidentiary issue at the penalty phase, here we must determine whether, without the prosecution's expert testimony, there is a reasonable *probability* the verdict would have been different. The standard is more exacting, but the present record supports such a finding for much the same reason as in *Gonzalez*.

14

Today's opinion accurately presents the evidence supporting petitioner's guilt.  (Maj. opn., *ante*, at pp. 2–8, 24.)  I agree this evidence was substantial, and the conviction would survive a sufficiency-of-the-evidence review.  At the same time, all of the prosecution's evidence was circumstantial, and a guilty verdict was not a foregone conclusion.  Petitioner's defense highlighted the limited amount of time petitioner would have had to commit the crime even if he had sped home from his workplace that night, driving much faster than the posted speed limit.  Other evidence showed that the victim had answered her phone throughout the day but then stopped answering the phone hours before petitioner came home, with no indication she had left the premises.  And although a prosecution witness testified that bloodstains on petitioner's pants and shoes were consistent with spatter as a result of standing near the victim when the injuries were inflicted, a defense expert testified that the spatter was consistent with contact or transfer when petitioner cradled the body postmortem.

The first two trials to reach jury deliberations both ended with hung juries.  The final jury also declared it was deadlocked and sought further instruction on the meaning of "reasonable doubt."  The trial court denied petitioner's motion for a mistrial and refused further instruction on the meaning of "reasonable doubt," sending the jury back to deliberate.  Three and a half hours later, it returned a verdict of guilt.

The main difference between the two trials ending in hung juries and the final trial ending in a guilty verdict was the bite mark evidence, which was offered only at the final trial.  The purported bite mark was the evidence that most directly linked petitioner to the crime.  Moreover, the bite mark evidence was not limited to Dr. Sperber's verbal testimony that a lesion on the victim's hand was a bite mark matching petitioner's unusual dentition.  Dr. Sperber also prepared a mounted photograph of the lesion along with a plastic overlay created from dental

15

molds of petitioner's lower teeth, which could be flipped up and down to demonstrate the "match" between the two. The photograph, overlay, and dental molds were all admitted into evidence and available to the jurors during deliberations. Further, Dr. Sperber estimated that only one or two out of a hundred people share petitioner's dental abnormality. Even taking into account Dr. Sperber's admission that he did not know of any scientific studies to back up that estimate, his expert testimony on the uniqueness of that feature, which was undisputed by petitioner's trial expert, increased the probative value of Dr. Sperber's testimony at the final trial.

When viewed in the context of the remainder of the evidence, Dr. Sperber's testimony was substantially material and probative of petitioner's guilt. Indistinct as it was, the lesion on the victim's hand provided a direct and visceral link between petitioner and the injuries inflicted upon the victim. And while Dr. Sperber concluded only that the lesion was "consistent" with petitioner's teeth, he coupled that finding with additional testimony that significantly narrowed the range of possible suspects by focusing on petitioner's unusual dentition. In particular, Dr. Sperber's estimate that just one or two out of one hundred individuals share the same unusual dentition amplified the probative value of the evidence. Near the end of his closing argument, the prosecution relied on this piece of evidence: "And, oh, this person [who committed the crime] also just happened to share the same dental abnormality as William Richards, who is only shared by two percent of the population. [¶] . . . [¶] That's what you are looking at. And that, folks is unreasonable. That doesn't wash." Without the bite mark evidence, two juries hung. Even with that evidence, a third jury deadlocked before returning a guilty verdict. The totality of the circumstances leads me to conclude that Dr. Sperber's testimony was sufficiently probative and material to cast doubt on the outcome.

16

In sum, the underlying basis of Dr. Sperber's trial testimony as well as the testimony itself have been proven false by a preponderance of the evidence, and it is reasonably probable that the verdict at the final trial would have been different without Dr. Sperber's testimony.  Accordingly, I would reverse the Court of Appeal's decision and grant petitioner's request for habeas corpus relief.


LIU, J.

WE CONCUR:

WERDEGAR, J.
CHIN, J.

17

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Richards
_____

**Unpublished Opinion** NP opn. filed 11/19/10 – 4th Dist., Div. 2
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX
**Rehearing Granted**

_____

**Opinion No.** S189275
**Date Filed:** December 3, 2012
_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Brian McCarville

_____

**Counsel:**

Jan Stiglitz for Petitioner William Richards.

Cooley, Lori R. Mason, Kyle C. Wong and Kathlyn A. Querubin for The Innocence Network as Amicus Curiae on behalf of Petitioner William Richards.

Michael A. Ramos, District Attorney, Grover D. Merritt and Stephanie H. Zeitlin, Deputy District Attorneys, for Respondent The People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jan Stiglitz
225 Cedar Street
San Diego, CA  92101
(619) 525-1697

Stephanie H. Zeitlin
Deputy District Attorney
412 Hospitality Lane, First Floor
San Bernardino, CA  92415-0042
(909) 891-3302